## RUSSELLVILLE CANNING CO. v. AMERICAN CAN CO.

### Civ. No. 706.

United States District Court
W. D. Arkansas, Fort Smith Division.
Dec. 19, 1949.

486

J. M. Smallwood, Russellville, Ark., Walton Hamilton of Arnold, Fortas & Porter, Washington, D. C., for plaintiff.

Daily & Woods, Fort Smith, Ark., G. C. Hardin, Fort Smith, Ark., John F. Mac- Lane, Charles J. Colgan, Cyrus R. Vance, Burton M. Abrams, all of Simpson, Thacher & Bartlett, New York City, for defendant.

JOHN E. MILLER, District Judge.

Plaintiff, Russellville Canning Company, a partnership organized and operating under the laws of the State of Arkansas, is suing defendant, American Can Company, a corporation organized and operating under the laws of the State of New Jersey and doing business in Arkansas, for treble damages under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, and bases its cause of action upon alleged violations by the defendant of the Robinson-Patman Act, 15 U.S.C.A. § 13.

Plaintiff charges discriminations in the following particulars:

(1) Freight charges resulting from freight equalization with Fort Smith, Arkansas. Collateral thereto is a claim for damages for lost profits in 1945 allegedly caused by defendant's failure to deliver cans according to the contract between plaintiff and defendant.

(2) Quantity discount payments made to certain named customers of defendant and withheld from plaintiff. This claim is properly broken down into two parts, because of defendant's change in its quantity discount schedule on January 1, 1946. Prior to that date the maximum was 5% and subsequent thereto 3%.

(3) Runway allowance of 45¢ per thousand cans made to Morgan Packing Company at its Austin, Indiana, plant and not extended to plaintiff.

Plaintiff contends that such discriminations in price resulted in substantial injury to its business and property, and that it has suffered damages not only in the amount of the additional business expense imposed by the excess charges but in the impairment of its competitive position.

At the conclusion of the plaintiff's case in chief, the defendant filed a motion to dismiss, and the court deferred action on the same until the close of the case. On November 7, 1949, the court overruled the motion, but before considering and discussing the alleged price discriminations

and other issues, it seems proper to discuss generally the issues raised by the motion.

The Robinson-Patman Act, supra, provides, inter alia, as follows:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing contained in * * * shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered * * *:

"(b) Upon proof being made * * * that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section * * *: Provided, however, That nothing contained in * * * shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor. * * *

"(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

Title 15 U.S.C.A. § 15 provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * *, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Thus, the plaintiff must show a discrimination in price, the effect of which may be substantially to lessen competition or tend to create a monopoly, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

The Congress, in amending the Clayton Act by the Robinson-Patman Act, gave emphasis to the protection of small business, recognizing that the Clayton Act had been too restrictive in requiring a showing of general injury to competition, and by the enactment of the Robinson-Patman Act, intended to allow a finding of injury to competition by a showing of "injury to the competitor victimized by the discrimination." Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 49, 68 S.Ct. 822, 830, 92 L.Ed. 1196, 1 A.L.R.2d 260, and footnote 18 for statement of Senate Judiciary Committee.

The language of the statute requires only that the effect of the price discriminations *"may be* substantially to lessen competition * * * or to injure, destroy, or prevent competition * * *." (Emphasis added.) As stated in Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 738, 65 S.Ct. 961, 967, 89 L. Ed. 1320: "It is to be observed that section 2(a) does not require a finding that the discriminations in price have in fact had an adverse affect on competition. The statute is designed to reach such discriminations 'in their incipiency,' before the harm to competition is effected. It is enough that they 'may' have the prescribed effect."

And, in Federal Trade Commission v. Morton Salt Co., supra: "The statute requires no more than that the effect of the prohibited price discriminations 'may be substantially to lessen competition * * *

or to injure, destroy, or prevent competition.' After a careful consideration of this provision of the Robinson-Patman Act, we have said that 'the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they "may have such an effect." ' " It is noted that in the latter case Mr. Justice Jackson takes issue with the language "reasonable possibility" and would require "reasonable probability", but this distinction is immaterial in the instant case.

It would appear, therefore, that as a practical matter the requisite of adverse effect on competition will follow as a matter of course when it is shown that a seller has charged one purchaser a higher price for like goods than he has charged one or more of the purchaser's competitors. Certainly, this has been the result in the Federal Trade Commission cases, as readily appears from the following statements of the court in the Morton Salt case, supra. At page 46 of 334 U.S., at page 828 of 68 S.Ct., 92 L.Ed. 1196, 1 A.L.R.2d 260, the court stated: "Here the Commission found what would appear to be obvious, that the competitive opportunities of certain merchants were injured when they had to pay respondent substantially more for their goods than their competitors had to pay."

And, 334 U.S. at page 50, 68 S.Ct. at page 830, the following statement appears: "It would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers."

 When the plaintiff makes this showing, price differential with an adverse effect on competition, it has made out a prima facie case of unlawful discrimination. Under a proviso of Section 2(a), the defendant may justify price discriminations by showing that the differentials make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from differing methods or quantities in which such commodities are to such purchasers sold or delivered. Under the general principles of statutory construction, approved in Federal Trade Commission v. Morton Salt Co., supra, 334 U.S. at page 44, 68 S.Ct. 822, and under the specific terms of the Act, Sec. 2(b), 15 U.S.C.A. § 13(b), the burden is upon the defendant to establish the claimed justifications. It should be noted that a proviso in Sec. 2(b) permits a seller to rebut a prima facie case by showing that the discriminations were made in good faith to meet an equally low price of a competitor. Apparently such a showing is not an absolute defense, but is a matter of evidence raising a question of fact as to whether the competition justified the discrimination, and emphasis is placed on individual competitive situations, rather than upon a general system of competition. Federal Trade Commission v. A. E. Staley Mfg. Co., 324 U.S. 746, 752, 753, 65 S.Ct. 971, 89 L.Ed. 1338; Standard Oil Co. v. Federal Trade Commission, 7 Cir., 173 F.2d 210, 215, 216. However, as the court understands defendant's contentions, it is not attempting to justify any price differentials by urging that lower prices were made in order to meet a competitor's low price, and the justifications attempted are based upon "only due allowance for the differences in the cost of manufacture, sale, or delivery."

The defendant contends, and this contention was the basis of its motion to dismiss, that the testimony introduced by the plaintiff failed to establish injury, destruction or prevention of competition, required by Sec. 2(a), or injury to its business or property, required by Sec. 4, and that, therefore, plaintiff's case fell of its own weight, with the necessary result that the burden imposed upon the defendant to justify affirmatively the alleged discriminatory practices never arose. Defendant would distinguish between proceedings by the Federal Trade Commission and private actions, the former being principally injunction proceedings wherein it is necessary to forestall discriminations "in their incipiency," thereby

preventing future discriminations regardless of what has occurred in the past, and the latter for the recovery of monetary damages for past injury. Thus, defendant contends, it is sufficient if the Federal Trade Commission establishes price discriminations the effect of which "may be" to adversely affect or injure competition, but "in private actions brought for violations of section 2(a), the subjunctive "may be" of potential injury (upon which the Commission may act) must be converted into the indicative "does", denoting actual injury, destruction or prevention of competition inimicable to the individual plaintiff." Finally, defendant contends that plaintiff cannot recover "general damages" under Section 2(a); that "special damages" must be shown to be the result of defendant's acts; that no such showing has been made; and that, therefore, plaintiff has failed to establish a claim entitling it to relief.

■ To sustain defendant's contention the court would have to rewrite Section 2, for subsection (a) declares that price discriminations which "may", not "do", lessen or injure competition are unlawful, and no distinction is made between Federal Trade Commission proceedings and private actions. Therefore, in order for the plaintiff to make out a prima facie case of unlawful price discrimination, it need only establish that it was charged more for its cans (there is no question here but that products of like grade and quality are involved) than other customers of defendant who are competitors of plaintiff and that the effect of this discrimination "may be" to lessen or injure competition between plaintiff and the named competitors of plaintiff. Of course, in the usual case, if the purchaser has a valid claim, as the plaintiff does here, the proof will be sufficient to establish that the discriminations did injure competition. At this point the burden is cast upon the defendant to justify, if it can, such discrimination, and if a justification is not or cannot be sufficiently established, then the plaintiff has shown an unlawful discrimination under Section 2(a), or the "anything forbidden in the anti-trust laws" required by Section 4, and it may recover treble damages if it can show that it has been injured in its business or property by reason thereof.

■ The plaintiff admits, and the court agrees, that it cannot recover damages unless it has established an injury to its business or property, but this problem does not arise until an unlawful price discrimination has been established. In this regard only, is the burden on the plaintiff in a private action different from or greater than the burden in a Federal Trade Commission proceeding. And, as the court understands the law, normally the burden is greater only when the injured party seeks to recover special damages, as in the instant case, wherein the plaintiff is seeking to recover damages for the impairment of its competitive position. Thus, when it is established that a seller has charged one purchaser a higher price for like goods than he has charged one or more of the purchaser's competitors, and the seller cannot sufficiently justify the price differential, the purchaser paying the higher price normally will have established the necessary adverse effect upon competition (that he has been injured in his competitive opportunities) and the required injury to business and property, which, in the absence of extraordinary circumstances, will entitle him to damages in at least the amount of the discrimination. In the instant case the proof is more than ample in this regard, and justifies the awarding of damages to the plaintiff not only in the amount of the discrimination, but for the impairment of its competitive position, as will subsequently appear.

In accordance with the above, defendant's motion to dismiss was overruled.

Formal findings of fact and conclusions of law, separately stated, are being filed with the Clerk of the Court simultaneously with the filing of this opinion, and only such facts will be referred to herein as are necessary to an understanding of the issues discussed.

It seems proper to discuss first the questions involved in the freight payments made by the plaintiff.

The material facts of this phase of the case may be briefly summarized as follows: On April 24, 1943, plaintiff, as buyer, signed an exclusive contract with defendant, as seller, for the purchase of all its requirements of sanitary cans and began regular operations on June 1, 1943. The contract expired on December 31, 1947, and was not renewed. Inter alia the contract contained the following provision: "No. 7 Deliveries: Cans named in this contract shall be delivered as wanted by Buyer, upon reasonable notice to Seller, F.O.B. Seller's factories, freight equalized with St. Louis, Missouri, except on such sizes and styles of cans as may not be made at Seller's St. Louis, Missouri, factory. Sizes and styles of cans Seller may not make at its St. Louis, Missouri, factory shall be F.O.B. point of shipment." The contracts of a number of customers in the Ozark Region (which here means the Arkansas River Valley in Arkansas and Oklahoma and Northwestern Arkansas and Southwestern Missouri) also provided for St. Louis equalization. Some specified Maywood or Hoopeston, Illinois, these cities having been equalization points at the time the contracts were executed. None, however, provided for equalization with Fort Smith, Arkansas.

By the year 1940 the Ozark Region had developed to the point that the various canners were insisting upon the location of a can factory or similar facility in the Ozark Region to insure prompt delivery of cans and to place it on a par freightwise with other canning areas throughout the country. The defendant made a study of the situation and concluded that while a factory would not be justified at that time the situation could be reasonably met by the establishment of a warehouse at Fort Smith, Arkansas. Fort Smith was selected because of its size, central location and the availability of railroad and highway facilities. The warehouse opened on June 2, 1941, and continued in operation until December, 1946, when it was discontinued upon the completion of defendant's Fort Smith factory. After its opening, freight was equalized with Fort Smith to all customers in the region to whom it meant a lower freight cost. It should be noted here that freight equalization with Fort Smith continued until December 31, 1945, only, although the warehouse was operated until December, 1946, as above stated. From a total of 7,851,086 cans delivered in 1941 from the warehouse, the yearly total increased to a total of 24,730,148 in 1945, the year freight equalization with Fort Smith ceased. For the entire period of its operation there were 83,389,496 cans delivered from the warehouse, and during the peak year, 1945, approximately 30% of the region's demands were handled through the warehouse.

From the date it began operations, June 1, 1943, plaintiff received its cans with freight equalized with Fort Smith instead of St. Louis, as provided in its contract. The freight rate from St. Louis, Missouri, and from Terre Haute, Indiana, the defendant's factory from which most of the cans supplied to the Ozark Region were manufactured, was the same to Fort Smith, Arkansas, Alma, Arkansas, and Russellville, Arkansas. This means that the plaintiff, and Good Canning Company of Fort Smith, Arkansas, hereinafter referred to as Good, and Alma Canning Company of Alma, Arkansas, hereinafter referred to as Alma, would have expended the same amount of money for freight with freight equalized at St. Louis, whereas with freight equalized at Fort Smith, Good got its cans freight free, Alma with a small freight charge and plaintiff with a larger freight charge.

Plaintiff continued to receive its cans with freight equalized with Fort Smith until the end of 1944, after which it refused to accept shipments with freight equalization other than according to the letter of the contract. Thus, in February, 1945, plaintiff ordered nine cars of cans requesting shipment in accordance with its contract "letter for letter". The cans were shipped with Fort Smith equalization, and plaintiff refused to accept them, and did not accept them until defendant had proffered invoices showing St. Louis equalization and paid certain demurrage charges. In May, 1945, plaintiff ordered three cars of cans, which were refused until invoices

showing St. Louis equalization were presented. These shipments, and the ensuing controversies, are the basis of plaintiff's claim for damages due to lost profits on Texas spinach and on mustard greens which it contends it was unable to can, and, thus, unable to fill standing Government orders. (This claim will be discussed subsequently). Thereafter, on all shipments defendant tendered dual invoices on each shipment, one set showing Fort Smith equalization and the other St. Louis, and in all instances plaintiff paid St. Louis equalization.

During the period between June 1, 1943, and December 31, 1945, plaintiff paid $23,235.39 in freight. Of this sum defendant has tendered back $5,286.55, being the amount paid in 1945 over and above freight charges equalized with Fort Smith.

Also, it might be noted here that defendant does not have a factory at St. Louis, but freight was equalized at that point because of the existence of a competitor's can factory in that city. In this case there is no question as to the legality of equalizing freight with St. Louis, if it had in fact been so equalized, because there would have been no discrimination between plaintiff and its Ozark Region competitors.

Defendant seeks to justify Fort Smith equalization in the following manner. (1) equalization with a factory is proper; (2) a bona fide warehouse is the equivalent of a factory for equalization purposes; and (3) the Fort Smith warehouse was a bona fide warehouse.

■ With the first contention the court finds no fault, for equalization with a factory, provided that factory is the normal source of supply, results in the same net mill realization to the seller and though there be differences in the delivered prices to the purchasers, depending upon their location in relation to the factory, such differences are justified as delivery costs. Although the court is not directly concerned with the problem, it may be that there is nothing inherently evil or unlawful in basing point systems, either single or multiple, if they can be justified as good faith attempts to meet the low price of a competitor, provided there is no industry-wide or nation-wide collusion or conspiracy or combination in restraint of trade. However, since the court is not here concerned with lower prices to meet the price of a competitor, prices that bear relation to factors other than actual costs of production or delivery, are price discriminations within the prohibition of Section 2 (a), provided of course, there exists the required effect upon competition. Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 732, 65 S.Ct. 961, 89 L.Ed. 1320. This problem usually arises in so called "delivered price" systems, for such systems inevitably involve phantom freight or freight absorption on the part of the seller and result in varying net mill realizations. For present purposes, there is no difference in legal effect between phantom freight and freight absorption. Bond Crown & Cork Company v. Federal Trade Commission, 4 Cir., 176 F.2d 974. The former occurs when there is a charge for freight in the delivered price which was not actually incurred, because the distance from the basing or equalization point is greater than the distance from the mill to the point of delivery. And, the latter occurs when the freight included in the delivery price is less than that actually incurred, because the distance from the basing or equalization point is less than from the mill or factory to the point of delivery.

The second contention in the justification may be put aside until the third is considered, for in the event of an adverse conclusion on the third, it will be unnecessary to consider the second.

■ As to the third, that the Fort Smith warehouse was a bona fide warehouse, it is necessary to approach the problem from the standpoint of the requirements of the law, and not from the standpoint of the good faith or generosity of the defendant in establishing the warehouse to aid the Ozark Region canners. The court finds no fault with and makes no criticism of the motives of defendant in establishing the warehouse, whether to aid the Ozark Region canners or to protect its own interests. Be that as it may, the fact remains that it cannot discriminate in the

price of cans to its customers if the discrimination is condemned by Section 2(a). Assuming that freight may be equalized with a warehouse located away from the factory, in order for such a warehouse to be bona fide, it would have to be the actual source of supply of the cans. Unquestionably, this warehouse was not, as it never supplied more than 30% of the needs of the Ozark Region, which included many canners other than Good, Alma and plaintiff. For the period involved plaintiff obtained approximately 5% of its supply of cans from the warehouse. The great majority of the cans came, not from the warehouse, but directly from defendant's Terre Haute, Indiana, factory to plaintiff and its Ozark competitors. The prices on these shipments varied according to factors, phantom freight or freight absorption (according to the way the method of charging for freight in this case is viewed, probably freight absorption being the proper designation), which are unrelated to any proper element of actual costs. See: Federal Trade Commission v. Cement Institute et al., 333 U.S. 683, 723, 724, 68 S. Ct. 793, 92 L.Ed. 1009.

The court uses "actual source of supply" in a reasonable sense, that is, that it be the source of supply under normal circumstances, recognizing that unusual conditions might arise where it is necessary to ship cans from other sources. In such instances, probably freight could be equalized with the normal source of supply without running afoul of Section 2(a), for it was not the purpose of the Congress to place an impossible burden on sellers. As above stated, the court finds it unnecessary to determine if a bona fide warehouse located away from the mill or factory could be a basing or equalization point, in view of its conclusion that this warehouse was not a bona fide one within the requirements of Section 2(a).

Also, it might be stated that "buyers locational advantage" referred to by defendant has reference to actual source of supply, as discussed above, for if it were otherwise, it would be subject to the whim of the seller to create a locational advantage on the part of favorite buyers by installing a warehouse nearby.

Turning now to a consideration of the effect of these practices on competition, the only reasonable conclusion to be reached is that they did have the necessary adverse effect on competition. Plaintiff was in direct price competition with Good, Alma and Charleston Canning Company (these companies were under common ownership after 1944) not only in disposing of its canned goods, which were substantially the same as the products packed by Good, Alma and Charleston, but in obtaining raw materials. When it is remembered that the price of cans is a substantial part of the cost of the finished product, it becomes clear that not only is there a reasonable possibility or probability that these discriminations in price injured competition between plaintiff and its named Ozark competitors but such discriminations did in fact so injure competition. Therefore, since defendant has not presented a sufficient justification, the discriminations in price became unlawful and forbidden by Section 2(a).

Furthermore, plaintiff was injured in its business and property by such price discriminations, and, in the opinion of the court, a protracted discussion is neither necessary nor desirable. This was an added business expense unlawfully placed upon plaintiff and necessarily adversely affected the chances of plaintiff to survive the keen competition. Indisputably, the difference of a few cents per case often makes the difference between a sale in the market, and likewise, the difference of a few cents makes the difference in obtaining the raw products necessary for operation. Defendant stresses the fact that the record fails to disclose many, or, indeed, any, instances where plaintiff was outbid for raw products or undersold in the market. However, in the opinion of the court, that is not of material importance, for the crux of the matter is, as the court views it, that because of the highly competitive nature of bidding for raw products and selling in the markets, plaintiff at least had to meet the prices of its named Ozark Re-

gion competitors or go out of business immediately. It did not choose to liquidate, certainly a natural choice, and in the long run the unlawful discriminations of defendant were bound to show up in profits and losses. Thus, plaintiff was injured in the most basic and fundamental way, from its point of view, a lessening of its chances of survival. It will not do to say that plaintiff is but a small business, and that the price discriminations were not large from a monetary standpoint, or that other factors, such as a declining economy, oversupply of raw materials, etc., contributed, because the fact still remains that plaintiff was subjected to price discriminations which worked to its disadvantage and to the advantage of its named Ozark Region competitors. It is to be remembered that Section 2(a) was designed to protect the small business man, and the court feels that the spirit and letter of that section compels the conclusion reached here, that the price discriminations, declared unlawful thereby, did injure the plaintiff in its business and property.

The second proposition that should be discussed concerns the quantity discount systems used by the defendant.

The schedule of discounts contained in the form of contract executed by the plaintiff was promulgated late in 1936, retroactively effective to June 18, 1936, the effective date of the Robinson-Patman Act, and granted discounts on the basis of quantity purchased yearly, as follows: under $500,000 no discount; from $500,000 to $7,000,000 discounts from 1% to 4%; and above $7,000,000 a discount of 5%. The system was set up by the officials of defendant on the basis of "past experience" and was not the result of a cost study during the preceding years.

The system resulted in differences in price between plaintiff and certain named competitors, California Packing Corporation (Calpack), a New York corporation, Libby, McNeill & Libby, Inc. (Libby), a Maine corporation, and Stokely-Van Camp, Inc. (Stokely), an Indiana corporation. As the system resulted in plaintiff paying substantially more for its cans than its above named competitors, it had the requisite adverse effect on competition, and the discussion previously made on this point is applicable here and need not be repeated. Therefore, the burden devolved on defendant to justify the differences as representing "only due allowance for differences in the cost of * sale *." As the court understands it, the attempted justification does not concern itself with cost of manufacture or delivery. On page 67 of defendant's brief it states: "We may agree that the amount of the discount in question must be measured by relation to the cost savings resulting from sales of the larger quantities to which the discount is applied and must represent no more than due allowance for such savings."

Defendant would discharge this burden by showing a cost study as follows: (Defendant's brief page 73) "In brief, sales expenses were divided among customers in Group A (over $7,000,000), Group B ($500,000 to $7,000,000), and Group C (under $500,000). Expenses were allocated primarily upon the basis of 'contact hours' of salesmen engaged in the sales of packers' cans, and the allocation of their time within the various quantity brackets. Sales office overhead and other undistributed expenses were allocated on a percentage basis, determined by the direct costs to which they were applicable."

This study was conducted from April 1, 1937, to December 31, 1941—four and three-quarter years. Thereafter the study was discontinued, and no study of costs was made during the period of the plaintiff's contract.

The actual functioning of the discount system resulted, during the period of the cost study, in but two purchasers qualifying for Group A, from a low of 19 to a high of 36 in Group B, and, of course, the remainder fell in Group C, from a low of 2109 to a high of 2960.

Effective January 1, 1946, the defendant inaugurated a new schedule of quantity discounts, and offered to each customer a new contract incorporating the new schedule. Such a contract was offered to the

plaintiff, but it refused to accept the same and continued to operate under its old form, which, as above stated, expired December 31, 1947. The new schedule was much broader and more inclusive than the old. Included in it were sales of general line as well as packers or sanitary cans, with the schedule beginning at .2% on $50,000 annual purchases and ranging upwards in various brackets to a maximum of 3% on annual purchases of $4,000,000 or more. No attempted justification was made of the new schedule by defendant, it taking the position that since the plaintiff refused the new contract the new schedule is not properly involved in the case, and in any event, the justification of the old system implicitly covers justification of the new.

The law pertaining to this phase of the case is comparatively clear, having had recent consideration by the Supreme Court in Federal Trade Commission v. Morton Salt Co., supra, and the following statements from that case reveal the governing principles binding upon this court:

"The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale * * *. (334 U.S. at page 43, 68 S.Ct. at page 826, 92 L.Ed. 1196, 1 A.L.R.2d 260)

"The Committee considered the present Robinson-Patman amendment to section 2 'of great importance'. Its purpose was to limit 'the use of quantity price differentials to the sphere of actual cost differences. Otherwise,' the report continued, 'such differentials would become instruments of favor and privilege and weapons of competitive oppression.' * * * (334 U.S. at pages 43 and 44, 68 S.Ct. at page 827)

"And it was in furtherance of this avowed purpose—to protect competition from all price differentials except those based in full on cost savings—* * * ." (334 U.S. at page 44, 68 S.Ct. at page 827)

In view of the condemnation contained in that case "that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability", the quantity discount system of defendant cannot . be approved merely because it was commercially impractical if not impossible to suspend discounts after the enactment of the Robinson-Patman Act. The defendant assumed the risk of being subjected to a private action for damages, such as the instant case, if its system made other than "due allowance".

However, the Act does permit price differences representing actual cost savings, and it is necessary for the court to consider and determine the merits of the justification made by the defendant. It might be noted that this court does not function as an expert in the field, as does the Federal Trade Commission, and it is not the purpose of the court to formulate a discount system within the sanction of the Act. The sole function of the court in this regard is to ascertain whether the defendant has made the requisite justification of its system.

The defendant's justification is based upon averages derived from an allocation of sales costs to the three groups into which it classified its customers for justification purposes. Separate costs were not presented for the three named competitors, Calpack, Libby and Stokely, nor for plaintiff. A literal interpretation of Section 2(a) would appear to call for a consideration of the sales costs to individual customers and to individual plants of customers who operate more than one. It is difficult to see in what other manner price differentials can be limited to the sphere of actual costs. Certainly if the chief purpose of the Act, the protection of small businesses, is to be achieved in any degree, some semblance of individual cost justification should be required. If a system whereby all of the small customers are lumped together in one group solely because of their quantity buying ability (which is the practical effect of this sys-

tem) is justifiable, then the Congress has done a futile thing in enacting this legislation, for, obviously, it has failed to correct the recognized evil whereby "a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability". It is inconceivable that the Congress meant to permit such a situation to continue. This, in the opinion of the court, is the ultimate fault to be found with defendant's system and justification thereof. The purchaser in Group C was doomed by the system to remain there, so long as its volume of purchases did not exceed $500,000, regardless of the cost incurred in selling it, and its identity as an individual, for cost purposes, was completely lost. It is significant that the breaking point, $500,-000, left the customers of defendant in substantially the same position as before the enactment of the Act, for roughly 2700 fell below that point, thus receiving no discount, and some 30 fell into the other groups, with but 2 in Group A. In other words, the "little fellows" were at the same competitive disadvantage from a quantity purchasing and discount standpoint as before.

The court recognizes the contention of defendant that "quantity discounts are justified vel non either according to their impact on competition or potential injury to customers on the one hand, or by the relevance of the supporting study in justification of such discounts to basically sound accounting principles." Plaintiff and its named competitiors receiving the maximum discount were active competitors in the same markets and often in the same stores, and the evidence in this case is more than ample to support the finding of the court that there existed the required adverse effect on competition. As to the latter point, the court is aware of the announcement of the Federal Trade Commission in the case of Minneapolis-Honeywell Regulator Co., C. C. H. Trade Reg. Serv. #13,-675 (1948), that "where they (cost studies) are made in good faith and in accordance with sound accounting principles, they should be given a very great weight." Although the court is not familiar with the

details of the discount system or the justification involved therein, it does appear that the system was very comprehensive with numerous "breaking points", and was based upon a study made by an independent accounting service. Also, the system was revised several times to meet changing conditions. Under those circumstances the Federal Trade Commission concluded that the company had made a good faith effort and its system was the best that was possible under the circumstances. It may be that this is a reasonable approach to the problem in view of the heavy burden on sellers, but defendant's system cannot qualify thereunder. Defendant had three broad classes, with practically all customers falling in Class C. It set up the system and then conducted studies for the test period to justify it (or to allocate costs already known) never changed it, and in fact, during the period of its dealings with plaintiff no study of costs whatsoever in regard to its discount system was made. This, in the opinion of the court, could not meet the most liberal "good faith cost study test".

The court realizes that the Act places a great burden on defendant, but it is also aware that that burden was deliberately so placed by the Congress. And, when the defendant made the quantity discounts, it necessarily ran the risk of violating the Act, and of bearing the consequences if it could not make the required justification.

■ As to whether a justification may be made other than on an individual cost basis, this court has no occasion to decide. Perhaps this is the only safe course to follow, but regardless of that, it is sufficient to hold here that defendant has not justified its quantity discount system as making only due allowance for differences in the cost of sale. At the very least the Act requires a more definite and specific justification of cost savings than defendant has presented.

■ As to the plaintiff's claim for the period covered by the new discount system, no justification was made by the defendant, it taking the position that the plaintiff could not claim damages under the new

contract because it refused to accept it, and in any event, the justification offered for the old system is ample for the new. It is the view of the court that plaintiff's claim is not founded in contract and that the law cannot be superseded by the terms of a particular contract. The law condemns a price discrimination caused by quantity discounts which has the requisite adverse effect on competition of which the court has found sufficient evidence here, unless it can be justified as making only due allowance for cost of sales. The justification of the old system has been rejected and as no other was offered for the new system, the same result must be reached on the new system as the old. It is noted that the limit on the new is 3% as compared with 5% on the old, but by virtue of the broadening of the base by including the purchase price of general line cans in the system, the large buyers will continue to receive approximately the same amount of discount as they received when the maximum was 5%.

No business ought to be condemned merely because it is big, but it ought to be required in selling to smaller business concerns to recognize the business practices of its customers and not consign a smaller business concern to an unfavored class merely because it is small unless the business practices of such customer are such as to create or cause the seller to incur actual costs of sale that it does not incur in other sales to other customers.

The facts as found by the court on this phase of the case make particularily applicable the words of Mr. Justice Black at page 48 of the opinion in 334 U.S. at page 829 of 68 S.Ct. in Federal Trade Commission v. Morton Salt Co. supra where he said: "Such discounts like all others can be justified by a seller who proves that the full amount of the discount is based on his actual savings in cost. The trouble with this phase of respondent's case is that it has thus far failed to make such proof."

■ In the opinion of the court, the evidence amply demonstrates that the unlawful price discriminations resulting from defendant's quantity discount systems injured plaintiff in its business and property. This point is adequately covered by that portion of this opinion dealing with the discriminatory freight charges between plaintiff and its named Ozark Region competitors, and that discussion is applicable here as to the unlawful discrimination resulting from defendant's quantity discount systems between plaintiff and its named nation-wide competitors.

The third question that requires consideration and discussion arises from the contentions of the parties on the allowances or payments made to Morgan Packing Company, one of the named competitors of plaintiff.

■ Defendant has a can factory at Austin, Indiana, from which a runway, or can conveyor, carries cans to an adjacent canning plant belonging to Morgan Packing Company. Morgan also has five other canning plants in Indiana, all five of which are at a distance from Austin great enough to make rail or truck transportation necessary. For all practical purposes the entire supply of cans purchased by Morgan for its six plants are delivered over the runway at Austin.

Defendant granted to Morgan a discount from list price of 45¢ per thousand upon all cans delivered across the runway, which, as stated above, went to all six Morgan plants.

Plaintiff contends that in utilizing the runway for delivery to Morgan and in granting the 45¢ per thousand discount defendant has violated both Section 2(a) and (e) of the Act, 15 U.S.C.A. § 13(a) and (e).

Section 2(e), supra, absolutely forbids disproportionate services or facilities, with no stated prerequisite of adverse effect on competition, as appears in Section 2(a). See: Elizabeth Arden, Inc., et al. v. Federal Trade Commission, 2 Cir., 156 F.2d 132, 134. It might be noted, however, that, in the opinion of the court, the facts of this phase of the case show the required adverse effect on competition.

It is not the province of the court to determine where the defendant should construct its can factories, or to censure the

defendant for constructing them wherever it may desire. That is a matter within the good faith discretion of the defendant.

Obviously a runway is only practical when the can factory is adjacent to a customer's canning plant, with the necessary result that runway facilities may be furnished to only a few of defendant's more fortunate customers. Therefore, in so far as the physical facility is concerned, as a practical matter, it would be impossible for defendant to furnish proportionally equal runway facilities to all of its customers. However, the fact that it is impractical, or even impossible, to furnish proportionally equal facilities to all customers cannot serve as a justification for furnishing the facilities to those where it is practical, if the furnishing of such facilities discriminates in favor of those receiving them. In other words, Section 2(e) condemns the discrimination, not the furnishing of facilities. And, the condemnation is just as applicable when the facilities cannot be furnished to all as when they are not furnished to all. This is consistent with the congressional intent to prohibit discriminations, either direct or indirect, which necessarily result in favored customers paying less than other customers for the same commodity. In Elizabeth Arden Sales Corporation v. Gus Blass Co., 8 Cir., 150 F.2d 988, 994, 161 A.L.R. 370, the court quoted the words of the Federal Trade Commission used in the cease and desist order issued against the appellant, in the Matter of Elizabeth Arden, Inc., Elizabeth Arden Sales Corporation, and Florence N. Lewis, F. T. C. Doc. No. 3133, C.C.H. Trade Reg. Serv. No. 12,962, as follows:

" * * * the statute affords the seller a free election in the first instance as to what services or facilities, if any, he will provide to purchasers of his products; but having elected to furnish a particular service or facility to a particular purchaser or purchasers, he thereby assumes the obligation of according similar services to all competing purchasers to the extent required by the statute. The furnishing of a service or facility which cannot be proportionalized for the benefit of competing purchasers or, in the alternative, the failure or refusal to proportionalize the terms upon which services or facilities are granted, so as to make it reasonably possible for competing purchasers to avail themselves of such services or facilities if they desire to do so, constitutes a failure to accord such services or facilities upon proportionally equal terms."

The defendant may in good faith construct its factories in certain localities and thereby incidentally create a locational advantage to those customers situated nearby. In such a case, defendant may sell f. o. b. the factory, provided it is the normal source of supply, and the nearer customers will receive their cans at a smaller delivered price than those less favorably situated. This, however, is not discriminatory for the difference is justified in delivery costs. When, however, additional facilities, the runway here, are furnished so that those near the factory receive their cans at a price lower than that normally incident to locational advantage, a discrimination does exist, and the seller, defendant here, must either furnish proportionally equal facilities to all customers purchasing that commodity, discontinue the furnishing of such facilities, or, in this case, discontinue the granting of a discount based upon the existence of the facilities. If this is not the law, then the way is open for sellers so inclined to circumvent the letter and spirit of the Robinson-Patman Act, the purpose which is to prevent discriminations in price to favored customers.

That the furnishing of this facility (and the facility may be said to be furnished regardless of who constructed it, for it is the utilization thereof to achieve the desired end, a lower price, that condemns it) resulted in a discrimination between Morgan and plaintiff cannot be denied. Plaintiff and Morgan were in competition, as will be discussed later, and Morgan received its cans, of like type, size and quality as those of plaintiff, for substantially less than plaintiff. Furthermore, the reult of the furnishing of this runway at Austin was that Morgan received the discount for cans used in its plants not connected with the runway. In the opinion of

the court, it was just such discriminatory arrangements as this that the Act was designed to prevent.

Therefore, the furnishing of the runway facilities to Morgan resulted in a discrimination within the condemnation of Section 2(e), and as a direct result thereof, plaintiff has been injured in its business and property because of the additional expense imposed thereby and the consequent lessening of its chances of survival.

Although plaintiff does not so contend, it may be that defendant has violated Section 2(d) in making the discount payments to Morgan without making them to plaintiff on proportionally equal terms. See: Elizabeth Arden Sales Corporation v. Gus Blass Co., supra. However, the legal consequences are the same under both Section 2(d) and (e).

But even though the furnishing of the runway to Morgan be not unlawful under Section 2(e), because of defendant's failure to furnish facilities proportionally equal to the plaintiff, defendant must justify the price differentials under Section 2(a), if it should be held, as plaintiff contends it should, that Section 2(a) is applicable to this phase of plaintiff's case.

Defendant contends that plaintiff and Morgan were not competitors. It is true that they did not pack the same products. Plaintiff packed green beans, spinach, mustard and turnip greens, while Morgan packed beans (packed with pork and kidney beans), pumpkin, kraut, hominy, beets, soup, spaghetti, carrots, carrots and peas, catsup, tomato juice, tomato pulp or puree and mixed vegetables.

Competition is defined in Webster's New International Dictionary, Second Edition, as follows:

"Act of competing, esp. of seeking, or endeavoring to gain, what another is endeavoring to gain at the same time; common strife for the same object; * * *.

"The effort of two or more parties, acting independently, to secure the custom of a third party by the offer of the most favorable terms; also, the relations between different buyers or different sellers which result from this effort."

The ends sought to be achieved and the evils sought to be eliminated by the Robinson-Patman Act can be fully realized only by taking a broad view of competition. Here, although plaintiff and Morgan did not pack the identical products, they both packed canned vegetables, sold them in the same markets, and the products of both often appeared on the same shelf in the same grocery store. Certainly, each was seeking what the other was endeavoring to gain at the same time; each was actively competing for the housewife's dollar and often for the dollar of the same housewife. Thus viewed, there can be no doubt but that Morgan was a competitor of plaintiff within the contemplation of Section 2(a). Furthermore, there can be no doubt that the price discrimination between plaintiff and its competitor, Morgan, had the necessary adverse effect upon competition and the burden devolved upon defendant to justify the differential.

Defendant would justify the 45¢ per thousand allowance to Morgan as making only due allowance for differences in the cost of delivery resulting from the differing method by which cans were delivered to Morgan, in that the small labor cost incurred on deliveries over the runway, comparatively small maintenance and capital charges, and other savings not capable of precise measurements more than justify the 45¢ per thousand allowance.

As set forth in the discussion under Quantity Discounts, defendant must show that the allowance was based upon actual savings in costs. The requirements of the law, both the statute and the cases thereunder, have been discussed adequately hereinbefore, and need not be repeated.

The fault found by the court with defendant's justification is more fully set forth in the findings of fact, the substance of which is that defendant has failed to justify the allowance as reflecting actual cost savings. In general, defendant compared cost figures between the Austin plant, which was designed specifically to serve Morgan over the runway, and the Terre Haute plant, which had no runway facilities and was designed to serve the general run of customers by rail; the court found

that the two situations are too different for accurate comparison; the figures of comparative costs run in terms of averages and cover only one year, and that single year is multiplied by five to get the five year period used for comparison; the figures used are too general as to kinds and types of labor and how the labor was employed, the costs incurred in the operation of the runway are not separated from costs incurred in the production of sanitary cans, and the line of jurisdiction between defendant and Morgan on the runway is not drawn; and defendant made no attempt to find and to isolate the comparative costs of delivery of cans of like size and kind with those used by plaintiff.

As stated in regard to the quantity discount system, at the very least, the Act requires a more definite and specific justification of cost savings than defendant has presented.

It follows, therefore, that as a direct result of defendant's runway allowances to Morgan, a competitor of plaintiff, the latter has been injured in its business and property, because of the imposition of this additional business expense and the consequent lessening of its chances of survival.

As appears from the above, plaintiff is entitled to recover for injury suffered because of the runway allowance granted to Morgan and denied to plaintiff under either 2(a) or 2(e).

Having discussed and resolved the contentions on the merits against the defendant, it becomes necessary to discuss and determine the extent of the damages suffered by the plaintiff. However, before proceeding to a discussion of the question of damages, it is necessary to consider the contention of defendant that plaintiff's claim for damages that occurred prior to three years preceding the filing of the complaint is barred by the applicable statute of limitations of the State of Arkansas. The defendant urges that there can be no recovery for damages to the business or property of plaintiff between June 1, 1943, the date upon which plaintiff began to purchase cans from defendant, and November 2, 1943. The original complaint was filed November 2, 1946, and by supple-

mental complaint was extended to cover time to expiration of contract, December 31, 1947. See: Lawlor v. Loewe, 235 U.S. 522, 536, 35 S.Ct. 170, 59 L.Ed. 341.

Plaintiff contends that assuming the applicable statute is Arkansas Statutes 1947, § 37-206, which fixes a three year period of limitation, the running of the statute was suspended by Act of Congress and consequently is not a bar to any of plaintiff's claim for damages.

The Act of Congress referred to was first passed October 10, 1942, 56 Stat. 781, and was amended June 30, 1945, 59 Stat. 306, 15 U.S.C.A. § 16 note, so that the suspension period ran from October 10, 1942, to June 30, 1946. It reads as follows: "That the running of any existing statute of limitations applicable to violations of the antitrust laws of the United States, now indictable or subject to civil proceedings under any existing statutes, shall be suspended until June 30, 1946, or until such earlier time as the Congress by concurrent resolution, or the President, may designate. This Act shall apply to acts, offenses, or transactions where the existing statute of limitations has not yet fully run, but it shall not apply to acts, offenses, or transactions which are already barred by the provisions of existing laws."

As to this Act, it is defendant's position that it is applicable only to civil and criminal suits instituted on behalf of the United States Government.

Ordinarily, if the intended meaning of statutory language is clear, no resort should be made to the legislative history. Only where language is susceptible of two or more constructions should the court look outside of the Act for the intended meaning. Giving to the language used in this Act its usual and accepted meaning, the conclusion is irresistible that the suspension applies equally to private and Government actions. The parties to this suit draw different conclusions from the legislative history, but, in the opinion of the court, nothing appears from that history which clearly indicates an intention to limit the application of the Act to Government actions only. Therefore, the Act should be administered as written, and the

language "civil proceedings" given its usual and accepted meaning. Tiffin Building Corporation v. Balaban & Katz Corporation, D.C.N.D. Ill.1949, 87 F.Supp. 121. Accordingly, this contention of the defendant is rejected, and plaintiff may recover for any damages incurred from the date it began purchasing cans from defendant, June 1, 1943.

The court's views on the question of injury to business and property by the discriminations in freight charges, quantity discount and runway allowance have been previously stated, the substance of which is that the discriminations placed an additional business expense on the plaintiff not placed on its competitors with the necessary result that plaintiff's chances of survival were considerably lessened. The actual impact, and the effect thereof, of these discriminations on the business of the plaintiff will be discussed subsequently.

■ The defendant contends that general damages are not recoverable under Section 2(a), and would distinguish the case of Elizabeth Arden Sales Corporation v. Gus Blass Co., supra, which allowed general damages. It argues that Section 2(e), involved in that case, incorporates the "most favored customer" doctrine in that under 2(e) disparate treatment in the furnishing of services and facilities is unlawful in and of itself without a showing of adverse effect upon competition, whereas in Section 2(a) unlawfulness of differences in price "turns upon proof that the questioned differences in price either specifically injures the individual who does not receive the lower price, or has or may well have an adverse effect upon competition generally."

In the opinion of the court, the distinction made by defendant is not sound. All subsections of Section 2 were designed to effectuate the policy behind the enactment of the Clayton Act, and the Robinson-Patman amendment thereto, it being the obvious purpose of the Congress to make the provisions comprehensive in order to prevent indirect as well as direct violations. And, when the requisite adverse effect on competition has been established, as in the instant case, there appears to be no valid reason to differentiate between 2(a) and 2(e) in the assessment of damages for injury to business and property.

The following statement by Mr. Justice Jackson in the majority opinion in the case of Bruce's Juices v. American Can Company, 330 U.S. 743, 757, 67 S.Ct. 1015, 1021, 91 L.Ed 1219, is in accord with this conclusion. "For despite petitioner's plaint on the difficulty of proving damages, it would establish its right to recover three times the discriminatory difference without proving more than the illegality of the prices. If the prices are illegally discriminatory, petitioner has been damaged, in the absence of extraordinary circumstances, at least in the amount of that discrimination."

In this regard, it should be noted that the court has condemned the runway allowance to Morgan under either or both Section 2(a) and Section 2(e). The Elizabeth Arden case, supra, 8 Cir., 150 F.2d 988, 161 A.L.R. 370, is direct authority for the imposition of general damages under 2(e), because of the additional expense imposed upon plaintiff by reason of the allowance to Morgan, a competitor, and the withholding of a similar allowance to plaintiff. However, the other phases of plaintiff's case fall under Section 2(a), and, for this reason, the above expression of the court's views was necessary. The Elizabeth Arden case, supra, 8 Cir., 150 F.2d 988, 161 A.L.R. 370, did not deal with Section 2(a), but as stated above, when the adverse effect on competition required by 2(a) has been sufficiently established, there is no reason to reach a contrary result as to general damages under the two subsections.

Furthermore, plaintiff claims damages for injury to its competitive position. In assessing damages of this nature, it is difficult to arrive at an exact figure due to the character of the only available evidence, but the court is not without guidance in the matter. It has been pointed out by the Supreme Court that "the rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of

their amount." Story Parchment Paper Company v. Paterson Parchment Paper Company et al., 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544. In this case it has been adequately established that the plaintiff has been damaged and that damage is definitely attributable to the wrong of defendant, so the only remaining question is the amount to be assessed as damages. In this regard the Supreme Court has stated, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652: "* * * the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

And, subsequently in the opinion: "In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. * * * Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim."

Plaintiff had its peak year in 1944. In 1945 it experienced a sharp decline, with sales decreasing approximately $304,501.69 and net profits approximately $111,503.12. And, from an aggregate of $167,126.35 for the period of December 1, 1943, to January 31, 1945, net profits fell to a net loss of $5,337.17 for the period February 1, 1947, to January 31, 1948. Also, an analysis of can purchases by plaintiff and its named competitors reveals that plaintiff's purchases declined year by year from a high of $158,575.05 in 1944 to a low of $61,094.-44 in 1947.

Of its named competitors, plaintiff alone showed such a marked decrease in net profits and can purchases. In fact, the analysis of can purchases (all of the named competitors purchased their entire supply of cans from defendant) shows that plaintiff's Ozark Region competitors did not reach their peak until 1946, and plaintiff's nation-wide competitors, who were the principal beneficiaries of the systems of quantity discount, continued to increase their purchases year by year, and in the face of a diminishing national demand, they obtained a larger and larger share of the national market at the expense of the smaller canners. While many factors may have played a part in affecting the competitive positions of plaintiff and its named competitors, the trade practices of defendant were the only common factors operating upon the destinies of all, and those practices worked to improve the competitive position of the named competitors while weakening the competitive position of plaintiff.

The cumulative effect of the unlawful discriminations first made itself felt in 1945, when plaintiff alone showed a a marked decline. It was during the first part of 1945 that plaintiff's controversy with defendant over the 12 cars of cans, hereinabove referred to, arose. Defendant contends that any losses suffered by plaintiff on account of the delay incurred in the delivery of the cans was plaintiff's own fault, and that it was the duty of plaintiff to accept the cars and thereby mitigate any damages that might arise. With this the court cannot agree, for plaintiff was but insisting that it get its cans in accordance with the contract and the law. Plaintiff had specifically warned defendant that it would refuse shipments not so made. Had plaintiff accepted these shipments as billed, it would have in effect continued to be a party to a violation of the terms of its contract and the law. It was not necessary for plaintiff to do so, and it should not be penalized now for its insistence on compliance with the contract and the law. Defendant had adequate notice of plaintiff's position on the matter, and defendant's actions thereafter were deliberate and with full knowledge of that position. Therefore, defendant is responsible for any legal damages flowing from its adopted course of conduct. However, this phase of the case should not be treated separately and is properly a part

of plaintiff's claim for damages to its competitive position. It will be so treated by the court.

. The evidence is legally sufficient to enable the court to make a just and reasonable estimate of the damages incurred by plaintiff.

 Thus, it appears that plaintiff has sufficiently established general damages under Section 2(a) and (e), which may be determined with exactness, and also, damage to its competitive position for which it is entitled to a sum which will reasonably compensate it therefor. However, there is necessarily a degree of overlapping when the assessment exceeds the amount of price differentials on account of freight charges, quantity discounts and runway allowances. In the final analysis it is believed that one award should be made which, within the theory of the law as understood by the court and as set forth hereinabove, represents reasonable compensation for the injury suffered by plaintiff to its business and property. Accordingly, the lump sum of $125,000.00 has been fixed as damages.