## AMERICAN CAN CO. v. RUSSELLVILLE CANNING CO.

### No. 14141.

United States Court of Appeals
Eighth Circuit.

July 27, 1951.

40

Charles A. Horsky, Washington, D. C. (Harry L. Shniderman, Washington, D. C., John P. Woods, Daily & Woods, all of Fort Smith, Ark., and Covington, Burling, Rublee, O'Brian & Shorb, Washington, D. C., on the brief), for appellant.

Walton Hamilton, Washington, D. C. and J. M. Smallwood, Russellville, Ark. (Arnold Fortas & Porter, Washington, D. C., on the brief), for appellee.

Before SANBORN, JOHNSEN, and RIDDICK, Circuit Judges.

SANBORN, Circuit Judge.

The Russellville Canning Company, a partnership, of Russellville, · Arkansas, owned and operated a canning plant at that place from June 2, 1943, to December 1, 1948, when it sold its physical assets to a corporation. The partnership, during the period June 2, 1943, to December 31, 1947, bought all of the cans which it used in its business of canning vegetables from the American Can Company, under a written contract. The total number of cans which were supplied by the Can Company to the partnership was 24,018,526, of a net invoice value of $568,559.10.

Upon the claim that it had been injured in its property and business by discriminatory practices of the American Can Company with respect to prices charged and facilities furnished, the Russellville Canning Company, as plaintiff, in 1946 brought this action against the Can Company for treble damages under Section 4 of the Clayton Act, 38 Stat. 730, Sec. 15, Title 15 U.S.C.A.[1] A supplement to the complaint was filed in 1949. The plaintiff asserted that the practices complained of were violative of Section 2 of the Clayton Act as amended by the Robinson-Patman Act, 49 Stat. 1526, Sec. 13, Title 15 U.S.C.A.[2]

1. "§ 15. *Suits by persons injured; amount of recovery*

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including· a reasonable attorney's fee."

2. "§ 13. *Discrimination in price, services, or facilities—Price; selection of customers*

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: .Provided, That nothing contained in sections 12, . 13, 14–21, and 22–27 of this title shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: *Provided, however,* That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established: * * *.

"*Burden of Rebutting Prima Facie Case of Discrimination*

"(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination

The defendant (appellant) denied that it had violated the Act in suit and that the plaintiff had been damaged by any of the practices of which it complained.

The issues were tried to the court in April, 1949. It determined that three of the practices asserted by the plaintiff to be violative of the Act had injured the plaintiff in its property and business to the extent of $125,000. These practices were: (1) equalization of freight with Fort Smith, Arkansas, on carloads of packers' cans shipped by the defendant to the plaintiff at Russellville, Arkansas, from factories in Indiana and Illinois during the years 1943, 1944 and 1945; (2) the granting by the defendant of a discount of 45¢ per thousand cans to the Morgan Packing Company, of Austin, Indiana, which had a plant adjoining a factory of the defendant and took delivery of cans from the factory over a cable conveyor or runway; and (3) the granting of quantity discounts by the defendant to its largest customers. The District Court concluded that these three trade practices were unlawful and actionable, and entered judgment against the defendant for $375,000, together with $42,000 attorney's fees. See Russellville Canning Co. v. American Can Co., D.C., 87 F.Supp. 484.

The defendant asserts that there was no adequate evidentiary or legal basis for the District Court's determination that the practices referred to were unlawful and had damaged the plaintiff in its business or property.

There has been no attempt by the parties to abbreviate the voluminous record on appeal. It contains a vast amount of detail. A statement of all the facts disclosed by the evidence would not be justified. We shall try to state enough of the evidentiary facts to show the situation which gave rise to the controversy and to this appeal.

The Ozark region, in which Russellville, Arkansas, is located, comprises that portion of the Arkansas River valley between Little Rock, Arkansas, and Fort Gibson, Oklahoma. The region is and has been a source of supply of spinach and green beans for the local canners of those vegetables. Many local canning plants buy their raw material in that area. The region probably ranks second in the volume of spinach canned.

The Good Canning Company, of Fort Smith, Arkansas, an old and long-established concern owned by W. H. Blaylock, in 1941 built a branch canning plant at Russellville, Arkansas. The vegetable growers in that area wanted a plant to buy their produce. The major reason for establishing a plant there was the belief that raw materials would be cheaper. There was also an abundance of unskilled labor obtainable there at minimum cost. The freight differential on cans as between Fort Smith and Russellville was not a deterrent. The places are about 80 miles apart.

The plant at Russellville started operations as a branch of the Good Canning Company in July, 1942. Arvel F. Blaylock, a brother of W. H. Blaylock, was its manager and continued as such until June 1, 1943. W. H. Blaylock died in July, 1942.

in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the [Federal Trade] Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

\* \* \* \* \*

*"Furnishing Services or Facilities for Processing, Handling, Etc.*

"(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms. \* \* \* "

On June 1, 1943, Arvel F. Blaylock, his wife, Elsie, his son Horace, then about 23 years of age, his daughter Lorene, about 20, and four members of the White family, formed a partnership under the name Russellville Canning Company, and purchased the Russellville plant. The purchase price was $60,000, which was borrowed from a bank and paid back out of the profits from the first nine months of operation. After the acquisition of the plant, the partnership spent $15,000 or $20,000 for new structures and equipment. Total invested capital did not exceed $80,000.

Arvel F. Blaylock was the exclusive manager of the business. He had an assistant named Keene, who left in 1945. Blaylock's children, Horace Blaylock and Lorene Blaylock Mackey, worked at the plant. Horace was plant Superintendent except while in the Army from September, 1944, to September, 1945, and for some months after his return from the service. His duties were to hire and fire and to see that production was maintained. He had nothing to do with sales. His father, Arvel F. Blaylock, was in full charge of the business until incapacitated by illness. Lorene Blaylock Mackey was at first a payroll clerk and later a secretary or stenographer.

In 1945 and 1946, Arvel Blaylock, because of illness, was able to work only part time. In 1947 he was obliged to stop work entirely, and the responsibility of operating the plant fell upon Horace and Lorene. Arvel Blaylock died in January, 1948, before the trial of this case. His evidence was taken by deposition in May and June of 1947, and is in the record. He had been in bad health for several years prior to his death.

The contract under which the defendant agreed to supply all the cans which the plaintiff might require in its operations up to December 31, 1947, was dated April 24, 1943. It was like the contract which the defendant had had with the Good Canning Company while the Russellville plant was a branch of that Company.

With respect to freight equalization, the contract of April 24, 1943, provided: "Cans named in this contract shall be delivered as wanted by Buyer, upon reasonable notice to Seller, F. O. B. Seller's factories, freight equalized with St. Louis, Missouri, except on such sizes and styles of cans as may not be made at Seller's St. Louis, Missouri factory. Sizes and styles of cans Seller may not make at its St. Louis, Missouri factory shall be F. O. B. point of shipment."

The defendant in June, 1943, when the plaintiff commenced operations, was not manufacturing packers' cans in its factory in St. Louis, nor was it equalizing freight on packers' cans shipped to its customers in the Ozark region with either St. Louis or the place from which the cans were shipped. Since June 2, 1941, the defendant had shipped all cans consigned to its customers in the Ozark region with freight equalized with Fort Smith, although none of its contracts with them called for such freight equalization.

In the can manufacturing industry, it has been the practice for a can manufacturer to locate a can factory as near as possible to each large canning area, in order to supply the needs of can customers in that area. Distance from a factory affects canners both with respect to the time and cost of delivery. In 1941, the majority of can factories were within 100 miles of canning plants. If a competitor of the defendant built a factory nearer a canning area than any factory of the defendant, the defendant's practice was to equalize freight on cans shipped to its customers, in the area, with the competitor's factory if doing so would give the customers a lower delivered cost. While the defendant in 1941 had no factory of its own in St. Louis making packers' cans, it equalized, prior to June 2, 1941, freight with St. Louis on such cans shipped to its customers in the Ozark region, because one of its competitors had in 1937 established a plant in St. Louis which made such cans. This was the packers' can factory then nearest to the Ozark region. Prior to the establishment of this rival factory in St. Louis, packers' cans made by the defendant at its factories in Maywood or Hoopeston, Illinois, or Terre Haute, Indiana, were shipped to the Ozark region with freight equalized with whichever of those three points would produce the lowest

delivered price to the consignee. Equalizing freight with St. Louis gave the Ozark canners a lower freight cost than freight equalization based on a factory point in Indiana or Illinois, although St. Louis was more than four hundred miles from the Ozark region.

The defendant, between the years 1939 and 1943, had supply contracts with fifty or sixty canners in the Ozark region. In response to a demand from its customers there, in or about 1940, that something be done to improve their competitive position as it was affected by freight rates, the defendant made an investigation to determine the economic feasibility of building a factory at Fort Smith. The defendant decided that the demand for cans in the Ozark region was not then great enough to warrant the establishment of a factory at Fort Smith at that time, but would be later. Nearly every other spinach-growing area in the United States was closer to a can factory then was the Ozark region. There was talk of some competitor of the defendant being induced to establish a factory at Fort Smith. The defendant did not want to lose its customers.

The defendant decided to rent a building in Fort Smith as a warehouse for the storage of packers' cans, to assist the Ozark canners in taking care of the peaks and valleys in their demands for cans and to provide a point for the equalization of freight on cans shipped to them. The defendant's customers had agreed that if such a warehouse was established in Fort Smith, they would renew their supply contracts with the defendant. It rented a building adequate for use as a warehouse, with rail facilities. The defendant chose Fort Smith as a location because it was centrally located in the territory and had suitable transportation facilities. The warehouse was established in 1941. Practically all the defendant's contracts with its customers were renewed to the end of 1947.

Commencing June 2, 1941, all cans shipped into the Ozark region by the defendant were billed with freight equalized with Fort Smith, regardless of the provisions of its supply contracts relative to freight equalization. None of the defend-

ant's contracts with its Ozark customers called for equalizing freight with Fort Smith. Equalizing freight with that place gave them all a lower freight charge.

The freight rate on cans from St. Louis to Russellville, as well as to virtually all points in the Ozark region, was about 80¢ per cwt., while the rate from Fort Smith to Russellville was 36¢ per cwt. Cans ordered by the carload actually came from one of the defendant's factories in Terre Haute, Indiana, or in Hoopeston or Maywood, Illinois. Those ordered for the plant at Russellville, after it commenced operations in 1942 as a branch of the Good Canning Company, were sent direct to Russellville. The two canners located in Fort Smith, Good Canning Company and McClure-Lucas Canning Company (also referred to as Porter Lucas), paid no freight on cans consigned to them. Other Ozark canners, including the plant of Russellville, paid the factory price plus freight from Fort Smith. No customer of the defendant in the Ozark region, except the plaintiff, objected to the equalization of freight with Fort Smith. Factory prices on packers' cans were the same to all canners.

The warehouse in Fort Smith was opened by the defendant in July, 1941. Most of the cans came to the warehouse from Terre Haute, Indiana, in carload lots. The defendant employed a custodian for the warehouse. Two men assisted him practically all the time, and during peak periods, of which there were five each year, additional men were employed. The warehouse was about 160 feet long by 80 feet wide and normally contained between 25 and 30 carloads of No. 2 cans, 10 carloads of No. 10 cans, and five carloads of No. 2½ cans. It was the policy of the defendant to ship no cans from the warehouse in carload lots. They were obtained by truck from the warehouse by the canners, and were billed at the factory price. The custodian of the warehouse tried to keep it replenished. He was occasionally unable to fill an order, due to the heavy demand, but in most cases could fill it the following day. There were times when he had no cans. About 22 canners were served out of the warehouse. Some of them took practically all their re-

quirements for cans from it. The plaintiff at times trucked some cans from the warehouse.

During the period the warehouse was in operation (July, 1941, to December 31, 1945), the percentages per year of shipments of cans from it to the total shipments of cans to the Ozark region were as follows:

| 1941 (about 6 months) | 1942 | 1943 | 1944 | 1945 |
|---|---|---|---|---|
| 15 79% | 17.32% | 22.31% | 31.84% | 33.24% |

The practice of equalizing freight with Fort Smith was discontinued December 31, 1945. During 1946 the defendant was constructing a can factory at Fort Smith.

The first shipment of cans from the defendant's factory at Fort Smith was made in December, 1946. The factory makes No. 2 and No. 2½ packers' cans, and since it went into operation all such cans have been sold to the Ozark canners with freight equalized with Fort Smith. Freight on No. 10 cans, which are not made in Fort Smith, has been equalized with St. Louis. From December 31, 1945, until the defendant's factory at Fort Smith went into operation, No. 2 cans were sold to the Ozark canners with freight equalized with Memphis, Tennessee, where a competitor of the defendant had a factory making such cans. No. 2½ and No. 10 cans during 1946 were sold with freight equalized with St. Louis.

It should be noted at this point that the plaintiff makes no claim that any practice of the defendant with respect to equalizing freight was unlawful except during the period June 1, 1943, to December 31, 1945, when the defendant had only a warehouse in Fort Smith and was using Fort Smith as a basing point for freight on cans.

During the period that the plant at Russellville was a branch of the Good Canning Company, of Fort Smith (July, 1942, to June 1, 1943), with Arvel Blaylock as manager, cans were shipped to the plant with freight equalized with Fort Smith, except that in the beginning some cars of cans ordered by the Good Canning Company, at Fort Smith, were diverted at Russellville and a diversion charge of $7.00 a car paid the railroad company. That practice had been discontinued prior to

June 1, 1943, when the plaintiff purchased the plant.

Most of the cans ordered by the plaintiff during 1943, 1944, and 1945 came from the defendant's factory at Terre Haute, Indiana. Freight equalization was with Fort Smith on all cans. That practice continued without serious protest from the plaintiff until early in 1945. Orders for cans were wired to defendant's Chicago Office by, or with the authority of, Arvel Blaylock until January 1, 1947, and the cans delivered were, up to 1945, paid for through an arrangement for credit with the McManus-Heryer Brokerage Company, of Kansas City, Missouri. That company was employed by the defendant to supervise and guarantee the accounts of its Ozark customers who bought cans from it on credit.

Arvel Blaylock testified that he was under the impression that he would get part of the freight charges back by making claims for bad cans. He knew of no freight charges having been refunded to any Ozark canner. He knew before June 2, 1943, that the warehouse of the defendant at Fort Smith was being used as a basing point for freight on cans shipped to the Ozark canners by the defendant. He considered that the practice favored the canning companies in Fort Smith and Alma, Arkansas, "or anyone else that got a cheaper rate than the contract stated," and that it favored the plaintiff as against canners who were farther away from Fort Smith than was Russellville. He construed the contract between the plaintiff and the defendant as requiring freight on cans to be equalized only with St. Louis.

In February, 1944, Arvel Blaylock asked that the defendant consign cars of cans to the plaintiff at Fort Smith so that he might divert them in transit at Russellville and thus avoid any freight charges. This the defendant refused to do. At that time he did not ask that freight be equalized with St. Louis. He was hoping to get the defendant to consign cars to the plaintiff at Fort Smith so that he could divert them at Russellville. About February 15, 1944, Blaylock ordered four cars of cans shipped to Fort Smith, with the intention of divert-

ing them. The defendant refused to consign the cars to Fort Smith, and sent them to Russellville with freight based on Fort Smith, and the plaintiff accepted and paid for them. Blaylock testified that he wanted to be upon an equal footing with his competitors in Fort Smith and Alma; that he was trying to buy cans as cheaply as he could; that he wanted his cars of cans "exactly as Good, Alma and Porter Lucas [McClure-Lucas] was getting theirs"; and that he wanted "to get everybody on an equal basis."

In January, 1945, Arvel Blaylock had a conference with representatives of the defendant at Russellville. He had employed counsel who was present at the conference. Blaylock insisted that he should get his cans without freight added. He said he wanted his cans delivered "according to the terms of the contract letter for letter." He was told that the defendant would live up to the contract the way it had been performing it and that since freight on cans was being equalized with Fort Smith, that practice would have to continue.

After this conference, Blaylock took the position that he had the right to reject all shipments of cans carrying freight equalized with Fort Smith. The defendant's position was that Fort Smith equalization was in accordance with the contract "as performed and accepted by both of us at all times since its execution." This controversy between Blaylock and the defendant resulted in delay in the acceptance of cars of cans shipped to the plaintiff in February and May, 1945, for which delay treble damages were claimed.

Nine cars of cans ordered by the plaintiff arrived in Russellville about February 15, 1945. On February 14, 1945, Blaylock had wired the defendant as follows: "No further stalling on your part will be tolerated. We are ready to pack. If you do not deliver cans according to contract by Monday February 19, 1945 I am instructing our attorney to proceed with damage suit. We mean business."

On February 16, 1945, he wired the defendant that the plaintiff was refusing

drafts and returning the invoices on the cars. On February 17, 1945, defendant's counsel at Fort Smith wrote to counsel for the plaintiff as follows:

"Dear Sir:

"This will confirm the writer's conversation with you of this date. In our conversation we proposed that the drafts covering the nine cars of cans now at Russellville or en route be taken up by the Russellville Canning Company without prejudice to either party to the controversy. In this way you will have the cans for immediate use while the controversy is being worked out, or during the pendency of a suit should you carry out your plan to bring suit. That offer is hereby confirmed and the nine cars of cans are hereby tendered to you on the basis mentioned and without prejudice to any rights which you may have."

On February 20 the plaintiff sent the following wire to the defendant: "Retel we intend to strictly abide by the terms of our contract with you. We will accept and pay drafts on nine cars cans now in Russellville when drafts are drawn in accordance with the terms of contract."

The defendant's reply was: "Wire received we are redrawing drafts and invoices in accordance with the terms of your contract as requested but still offer to give you equalization with Fort Smith if you desire it."

On February 23 the plaintiff again wired the defendant: "Corrected Invoices on nine cars cans arrived. Unable pay drafts until our bank receives authorization to deduct demurrage charges incurred by each car. Since demurrage charges have accrued through no fault of ours we await this authorization."

The defendant replied by wire: "We are arranging with railroad company to pay demurrage. They are being instructed that we will do this on this basis. Railroad will on presentation of bills of lading release cars to you."

The delay in May, 1945, which the plaintiff claims caused it damage relates to three cars of cans ordered on May 16. On

May 19, 1945, the defendant wrote the plaintiff:

"In accordance with your telegraphic order of May 16th, we are shipping to you two cars of No. 2 plain cans in bulk and one car No. 10 plain cans in carriers for spinach.

"Invoices are enclosed for these cans freight equalized with Fort Smith, Arkansas, so as to equalize your prices with those of other customers in the same area. We also enclose invoices for these cans freight equalized with St. Louis, Missouri. If you prefer, pay us the amount of the invoices freight equalized with St. Louis, Missouri. You may do so, but we do not demand it. The invoices which you do not pay will be cancelled upon their re-return to us."

The shipments were mistakenly consigned to McManus-Heryer Brokerage Company, % Russellville Canning Company, apparently on the assumption that the plaintiff was still operating under the credit arrangement. Blaylock refused to accept the cars because of this mistake. It was not until June 6 that the defendant succeeded in straightening out this controversy to Arvel Blaylock's satisfaction by sending him a new bill-of-lading and paying demurrage on the cars. On June 7, the plaintiff sent the following telegram to the defendant: "We could have been running turnip and mustard greens for the last ten or twelve days but you have failed to furnish and ship cans according to contract. We are instructing our attorney to sue for damages for this loss. We have been unable to meet orders from our customers."

Arvel Blaylock testified that the delays respecting the nine cars in February, 1945, and the three cars in May, 1945, caused the plaintiff the loss of $12,900 in profits, estimated at $1,000 per car of cans intended to be used for packing Texas spinach in February plus $1,300 per car of cans ordered in May for mustard and turnip greens. Blaylock did not order any Texas spinach in February because he knew that the freight on the cans ordered would be equalized with Fort Smith and that he would not accept them that way. By the time the cars were finally accepted by him, Texas spinach had a white mold. He testified he would have run some Texas spinach in 1945 except for "the tie up over the cans." In February, 1945, he had on hand a substantial number of cans and was packing spinach, but no suitable local spinach was available.

The three cars of cans ordered in May, 1945, and shipped to the McManus-Heryer Brokerage Company, care of the plaintiff, were, according to Blaylock, intended for mustard and turnip greens. At that time everything packed in cans could be sold. The plaintiff could have obtained the cars of cans by paying invoices with either Fort Smith or St. Louis equalization. He had bought no turnip or mustard greens. The first packing of such greens in 1945 was June 16. He had a substantial number of cans on hand in May, 1945, apparently 276,445 No. 2's, 2,699 No. 2½'s and 1,348 No. 10's. Blaylock could point to no time in 1944 or 1945 when he did not have cans sufficient for a "reasonable operation". He testified: "I can state this, that there was probably times that I didn't have the proper cans for which [what] I was packing." With reference to the claim for damages allegedly resulting from the delayed shipments in February, 1945, and May, 1945, Blaylock testified: "I feel that we were damaged some and I think the Supreme Court will tell you so in their decision."

In March, 1945, the defendant sent to all of the Ozark canners with whom it had contracts, including the plaintiff, a letter offering to invoice all cans of such sizes and styles as were kept in stock at the Fort Smith warehouse with freight equalized with Fort Smith. All of the canners accepted the offer with the exception of the plaintiff.

The plaintiff during 1945 insisted on paying for its cans the factory price plus freight equalized with St. Louis. On May 14, 1945, in a letter to the plaintiff with reference to two carloads of cans ordered by it, the defendant wrote: "The two cars of cans to which you refer were shipped you on your order given under your con-

tract. These cans were invoiced to you with freight equalized with Fort Smith, Arkansas, for reasons with which you are entirely familiar. The total invoice price of the two cars is $3,360.70. If freight were equalized with St. Louis, Missouri, the total invoice price of the two cars would be $3,539.36. If you wish to pay us $3,539.36 instead of $3,360.70 for these cans, you may do so, but we do not demand it."

By letter of June 1, 1945, the General Counsel of the defendant advised the plaintiff that thereafter all cans would be consigned to it with two sets of invoices, one showing Fort Smith freight equalization and the other St. Louis equalization, with two sets of drafts to correspond, and that the bank at Russellville would be instructed to deliver the bill-of-lading on payment of either draft.

In order to illustrate Arvel Blaylock's attitude toward the defendant and the style of his correspondence, a typical letter of his is set out in the margin.[3]

During 1946 until the completion of its factory in Fort Smith, the defendant equalized freight with Memphis, Tennessee, on cans such as were made in a competing factory at that place. The first invoice the plaintiff received in January, 1946, for No. 2 cans carried Memphis freight equalization. The draft called for $1,549.44. The plaintiff increased the figure to $1,586.82 and paid the larger amount. This increase represented the difference between St. Louis freight and Memphis freight plus a 1% discount for

3. "RUSSELLVILLE CANNING COMPANY
Russellville, Arkansas
June 18, 1945.
"Mr. E. J. Lake
American Can Company
Chicago, Illinois
"Dear Sir:

"In answer to your letter of June 16, we are buying cans under Contract #1304 and if we know how to read, it most certainly does not say anything about equalizing with any other place other than St. Louis. Your offering anything other than contract is a bribery for the purpose of discrimination.

"You wired us the first part of this year that you had every intention of living up to Contract #1304 and expected us to do the same. So far we have not received a shipment of cans without a great delay by your trying to force us to take Fort Smith equalization. If the contract says anything other than St. Louis, why in the h— don't you show it to us. If St. Louis is the only place it says with regard to equalization, then why in the h— are you trying to force something else.

"If you recall, you offered us a rider to do away with paragraph #7 which we refused to accept. Therefore, our contract and all other contracts in this territory will have to be St. Louis, and you know this is right.

"We had never thought the American Can Company was as little as they are trying to act in this particular case. You will recall that while you and Mr. Bancroft were in our office our attorney asked you for some points which you agreed to have your attorney explain to him in writing. Your attorney never did write. We don't know just what you are all trying to do, but we will tell you this:—We intend to see this thing through the Supreme Court of the United States, then we will know definitely who is wrong. We are passing our opinions on the decisions of the Supreme Court last April with regard to the Corn Products and Staley Manufacturing Cases. They definitely state that there must be a factory to establish a basing point. They also definitely state that 'phantom' freight is discriminatory. We believe that if you will read these two cases you will see exactly what we are talking about.

"However, the particular case we are interested in at present is that you are continuously trying to get out of your contract by trying to force Fort Smith equalization which the contract says nothing about.

"We expect you to live up to this contract and we can't see any d— reason why you continually keep trying to do otherwise. You have cost this company several thousand dollars worth of damage so far this year, and we are sure you will pay every dime of it. So we cannot see any reason why you should keep offering us something that is not in the contract.

"Yours very truly,
Russellville Canning Company
(Signed) A. F. BLAYLOCK
Manager"

cash within ten days, which the defendant was then offering to all Ozark canners. The plaintiff refused to accept the benefit of the lower freight charges based on Memphis, and declined to accept the 1% discount for cash, on the ground that its contract with the defendant did not so provide. The plaintiff also refused an offer made by the defendant to all its Ozark customers of a new contract providing for more liberal quantity discounts to its smaller customers than did the old contracts. The plaintiff also refused to accept tenders made by the defendant of freight and other charges, voluntarily paid by the plaintiff, which exceeded those demanded by the defendant.

Arvel Blaylock managed the plaintiff's business until January 1, 1947. The plant canned principally spinach and green beans. In the years 1943 through 1946, about 30% of its pack was beans and 70% was spinach. About 98% of the spinach came from the vicinity of Russellville. The plaintiff share-cropped spinach by furnishing seed and fertilizer to local farmers and dividing the crops with them. This constituted its principal source of supply. Some mustard and turnip greens were canned prior to the latter part of 1946.

The plaintiff had no sales force of its own. It sold some of its products direct to chain stores, and in 1943, 1944 and 1945 to the Army, which required a substantial per cent of production until hostilities ceased in 1945. The marketing of the rest of its products was done through brokers. While wartime conditions prevailed, all of the Ozark canners could sell, at the ceiling prices fixed by the Government, all the canned goods they could produce. Canned spinach was decontrolled by the Government on May 22, 1946. Canned beans and greens were decontrolled September 12, 1946. The Army withdrew from the market on September 2, 1945, and cancelled all unpacked orders.

Apparently the break in the sellers' market for canned vegetables came late in 1946, which was a below average year for the canners. In the spring of 1947, there was more spinach available at one time than the canners could handle. The price of raw spinach went below the cost of production. As a result, the farmers, having lost money on their spring crop, did not plant sufficient acreage for the fall crop; so there was a shortage of spinach in the fall of 1947.

During the plaintiff's fiscal year January 31, 1945, to January 31, 1946, net sales were $588,542.14. In the fiscal year ending January 31, 1947, they were $581,529.97, and in the next fiscal year $272,420.07. Horace Blaylock, who, with his sister took charge of the plant in 1947, was asked to what he attributed the decrease in sales in that year. His answer was: "Well, to two things you might say. One would be the scarcity of raw materials, the buying of it, climatic conditions causing it to be hard to get. Now that is one thing that you would all be familiar with. The other would be if there is a surplus, when you have a buyers market, it is naturally more competitive, and it is harder to sell, and you would have to sell it for less. It would call a drop in the price."

He also testified that the plaintiff bought and packed all of the raw material it could profitably handle.

From June 30, 1943, to January 31, 1948, sales and profits of the plaintiff were as follows:

| Audit period | | Net Sales | Net Profits Before Taxes |
|---|---|---|---|
| 6/30/43 | to 11/30/43....... | $420,942.30 | $ 59,986 33 |
| 12/ 1/43 | to 4/ 8/44....... | 324,541.12 | 44,618.29 |
| 4/ 9/44 | to 1/31/45....... | 893,043.83 | ·122,508.06 |
| 2/ 1/45 | to 1/31/46....... | 588,542.14 | 11,004.94 |
| 2/ 1/46 | to 1/31/47....... | 581,529.97 | 25,623.24 |
| 2/ 1/47 | to 1/31/48....... | 272,420.57 | (5,337.17) |

Total net operating profits for that period of 4⁷/₁₂ths years or 55 months, minus the loss in the last year, were $258,403.69, or an average profit of about $4,700 a month. However, during the first 20 months of plaintiff's operations, it was earning at the rate of approximately $11,350 a month or $136,000 a year. In the next two years of the period, its earnings averaged about $18,000 a year, and in the last fiscal year it suffered its first loss in earnings. Plaintiff's total invested capital, as has been stated, at no time exceeded $80,000.

As evidence that the plaintiff did not retain or was not able to retain its competitive position in the vegetable canning

industry during the period in suit, there was introduced in evidence the following table showing the dollar volume of cans purchased by the plaintiff and by six of its named competitors during the years 1943 to 1947, inclusive:

"Table of

· Dollar Volume of Can Purchases by Years 1943-1947.

| | 1943 | 1944 | 1945 | 1946 | 1947 |
|---|---|---|---|---|---|
| Good Canning Co. | $ 136,476.79 | $ 238,535.09 | $ 305,759.00· | $ 359,444.36 | $ 208,650.04 |
| Alma Canning Co. | $ 267,447.03 | $ 296,456.49 | $ 264,949.86 | $ 398,323.96 | $ 325,764.20 |
| Calif. Pack Corp. | $8,611,452.98 | $9,460,881.29 | $9,166,271.29 | $11,784,615.14 | $15,503,615.43 |
| Libby, McNeil & Libby | $7,326,014.36 | $8,773,479.51 | $9,936,035.00 | $11,594,132.04 | $14,218,417.34 |
| Stokely | $5,649,613.68 | $5,909,685.34 | $8,473,590.48 | $ 9,411,423.79 | $ 9,992,554.59 |
| Morgan | $1,959,853.51 | $2,010,707.66 | $3,050,638.51 | $ 3,588,384.07 | $ 2,647,199.82 |
| Russellville | $ 122,002.66 | $ 158,575.05 | $ 121,185.94 | $ 105,701.01 | $ 61,094.44" |

It is apparent from what has been said that this litigation grew out of the controversy between Arvel Blaylock and the defendant because of its refusal to ship cans to the plaintiff free of freight charges. However, the plaintiff concluded that it had also been damaged in its business and property by the "runway allowance" granted by the defendant to the Morgan Packing Company, of Austin, Indiana, and by the defendant's system of quantity discounts. Both of these practices were asserted to be discriminatory.

The Morgan Packing Company had a canning plant at Austin, Indiana. It had five other plants in Indiana. It packed vegetables, but did not can spinach, green beans or mustard or turnip greens. It was a competitor of the plaintiff only in the sense that both packed and sold canned vegetables. The defendant built a factory adjoining the Morgan plant at Austin for the purpose of delivering cans to Morgan over a system of conveyors or runways connected with the production lines of the factory. The runway or conveyor system extending beyond the building line of defendant's factory was paid for by Morgan. All of the cans needed by Morgan for its six plants were delivered to the Austin plant by the defendant over the runway. Morgan took at least 90% of the cans produced at the Austin factory of the defendant. The defendant allowed Morgan a price discount of 45¢ per thousand on all cans delivered to it over the runway. A cost study introduced by the defendant tended to show that the saving in expense in the operation of the Austin factory, where cans were delivered by runway, over the expense of operating a factory like that at Terre Haute, where delivery was made by rail, was at least $.436 per thousand cans and justified the discount allowed.

If the plaintiff had received a discount of 45¢ for each one thousand cans which it purchased from the defendant during the period in suit, the plaintiff would have paid $10,808.24 less than it did pay, or four and one-half hundredths of a cent ($.00045) less per can, or $40.50 less per carload of 90,000 cans.

The contract between the plaintiff and the defendant provided for the following scale of quantity discounts based on the total net money value of annual can purchases by a customer:

| | |
|---|---|
| $7,000,000 or over | 5% |
| $5,000,000 or over, but less than $7,000,000 | 4% |
| $3,000,000 or over, but less than $5,000,000 | 3% |
| $1,000,000 or over, but less than $3,000,000 | 2% |
| $ 500,000 or over, but less than $1,000,000 | 1% |

In June, 1936, when the Robinson-Patman Act was passed, the defendant had a quantity discount system. The Act did not abolish quantity discounts, but limited them to such as made only "due allowance" for differences in cost of manufacture, sale or delivery "resulting from the differing methods or quantities" in which the goods were sold. The advent of the Act made it necessary for the defendant to change its quantity discount system.

Gordon H. Kellogg was in 1936 Vice-President of the defendant, in charge of sales of packers' cans. He had had more than 26 years experience in the manufacture and sale of cans, and had been with

the defendant since 1910. He was, at the time of the trial, Vice-President in charge of the Chicago Division of the Central Division of the defendant. His experience and some spot checking which he had done indicated to him that it cost three or four dollars per thousand cans more to sell small customers than large ones, who required less effort in sales and less attention in service. During the period 1936 to 1941 the defendant had between two and three thousand customers for packers' cans, of whom forty or fifty were large purchasers. Kellogg was of the opinion that it cost more proportionately to sell and service customers who bought less than $500,000 worth of cans annually than it did to sell and service those who bought in larger amounts. He had not, prior to 1936, made any cost studies to determine the difference in selling costs between the larger customers and the general run.

Upon the passage of the Robinson-Patman Act in 1936, Kellogg first discussed the matter of quantity discounts with the General Counsel of the defendant. They called in Judge Thacher, a former United States District Judge and former Solicitor General of the United States, who was then a member of the firm of Simpson, Thacher and Bartlett. They also talked with Albert G. Seidman, an investigator or examiner in New York for the Federal Trade Commission, who sat in on some of their conferences and made some suggestions.

Kellogg testified that counsel for the defendant advised that it should cancel all of its contracts as of June 18, 1936, the day before the Act became effective, take care of its obligations under the old contracts, and settle upon a new form of contract. Kellogg also testified that counsel advised that "we could make differences in price on account of difference in the cost of manufacture, sales and delivery, because of differences in quantity and methods, and we could not do it on any other basis, and we had to set up a different method of accounting."

The General Auditors of the defendant were also called upon for advice. Discussions continued for several months. The defendant's auditing department advised that the cost accounting records of the defendant were not sufficiently complete to show costs of selling to different groups on the basis of quantity of cans purchased. Kellogg, from his experience in cost of selling differences, concluded that a 5% quantity discount was all that ought to be allowed in the top bracket.

Without going into further detail,—the quantity discount system, with the 5% maximum, of which the plaintiff complains, was adopted effective June 19, 1936. It was predicated upon Kellogg's judgment, based upon his experience and adopted after discussion with other officers of the defendant and its General Counsel.

The auditing department of the defendant set up an elaborate system of cost accounting for the purpose of determining whether the quantity discounts were justified. It was started on April 1, 1937. For the purpose of the cost study the customers of the defendant were divided into three classes, "A", "B" and "C". Included in Class A were those who bought annually over $7,000,000 of cans, Class B included those who bought more than $500,000 but less than $7,000,000, and Class C those who bought less than $500,000.

Costs attributable to sales of packers' cans were allocated to the designated classes of customers on the basis of quantity purchased. The cost study did not reflect the cost of selling and servicing each individual customer. The paper work required by this cost study was very great. Apparently by the end of 1941, when the study was terminated, some six tons of records and reports had accumulated. On the advice of counsel, the defendant discontinued the study after December 31, 1941. The cost study made by the defendant indicated that the quantity discounts allowed by it to its customers purchasing more than $500,000 of cans annually were justified.

Herbert F. Taggart, Professor of Accounting and Assistant Dean of the School of Business Administration at the University of Michigan, and a Certified Public Accountant whose experience included much accounting work for several branches of the Government, testified, on behalf of

the defendant, that he had reviewed the system of accounting used by it in attempting to ascertain whether the quantity discounts granted its larger customers were justified. He stated that, in his opinion as an accountant, the system of accounting adopted by the defendant was "a well conceived, carefully operated and very well organized system."

On the other hand, William J. Warmack, a Certified Public Accountant who for seventeen years did important investigation and accounting work for the Federal Trade Commission, and was, at the time of the trial, a cost specialist in price discounts, testified, as a witness for the plaintiff, with respect to the price justification system of the defendant, that he had seen "none as crazy as this." His main criticisms of the defendant's attempted justification were that it dealt with too few classes of customers, did not adequately disclose individual differences between buyers with regard to selling costs, made no showing as to possible cost differences because of geographical location of customers, covered only costs during the period 1937 to 1941, inclusive, and attempted to sustain a quantity discount system under which only a very few large customers received any discount at all.

During the period June 19, 1936, to December 31, 1942, the number of customers of the defendant included in the three classes among which sales costs incurred by the defendant were allocated is shown by the following tabulation:

| | A | B | C |
| --- | --- | --- | --- |
| June 19, 1936, to December 31, 1936 | 2 | 26 | 2616 |
| 1937 | 2 | 29 | 2769 |
| 1938 | 2 | 19 | 2960 |
| 1939 | 2 | 30 | 2759 |
| 1940 | 2 | 32 | 2736 |
| 1941 | 2 | 36 | 2581 |
| 1942 | 2 | 34 | 2189 |

More than 98% of the customers received no quantity discount.

The defendant's system of quantity discounts was changed as of January 1, 1946. It was incorporated in a new form of contract and was applied to all purchasers accepting the new form. The plaintiff refused to become one of them. It adhered to the old contract. Under the new quantity discount system, discounts ranged from ¾oths of 1% on purchases of $50,000 to 3% on purchases of $4,000,000 or more. It applied not alone to purchasers of packers' cans, but to purchasers of all types of cans. For its justification of this system of graduated discounts, the defendant relied upon its cost study under the old system.

If the plaintiff had received a 5% quantity discount during the period June 2, 1943, to December 31, 1945, it would have paid $20,088.18 less for its cans. If it had received a 3% quantity discount from January 1, 1946, to December 31, 1947, that would have reduced its expenditures for cans by $5,003.86. If the plaintiff had received a discount of 45¢ a thousand on all cans delivered (such as the Morgan Packing Company received), it would have paid $10,808.24 less for the cans. If it had received its cans during the period June 2, 1943, to December 31, 1945, without any charge for freight, it would have saved $17,948.84 over what it was required to pay as freight charges. A total of all of these alleged price discriminations amounts to $53,849.12. If the damage suffered by the plaintiff can be measured by the sum of these several items and, in addition, an alleged loss of profits of $12,900 attributed to the defendant's failure to make lawful delivery of cans ordered in February and May, 1945, the plaintiff's actual damage would apparently be $66,749.12. In addition, the plaintiff claimed upon the trial that the damage to its "competitive position" was $100,000.

The named competitors of the plaintiff which it asserts were unlawfully favored by the defendant with respect to prices were: California Packing Corporation (Calpack), Libby, McNeill & Libby, Inc. (Libby), Stokely-Van Camp, Inc. (Stokely), Morgan Packing Company (Morgan), Good Canning Company (Good); Alma Canning Company (Alma), and Charleston Canning Company (Charleston). The last three of these named competitors are Ozark canners which canned the same products as the plaintiff as well as other kinds of vegetables. Good, Alma and Charleston came under common ownership after 1944. The

other companies named are large canners with multiple plants which can a great variety of food products and do a nation-wide business. None of their plants are in the Ozark region. With the exception of Morgan, each of them canned some of the same vegetables as the plaintiff during the period in suit.

### Freight Equalization.

With respect to the question of freight equalization with Fort Smith from June 2, 1943, to December 31, 1945, the plaintiff contends, and the court, in substance, ruled, that a warehouse such as that which the defendant established at that place could not lawfully be used as a basing point for freight upon carload shipments of cans which originated at the defendant's factories in Indiana and Illinois, and that, while Fort Smith freight equalization gave to all of the Ozark canners a lower delivered price for their cans, it resulted in creating price differences among them which would not have existed had freight been equalized with St. Louis or with the point from which the cans were actually shipped.

It is the plaintiff's theory that if all the Ozark canners had been required to pay St. Louis freight, all of them would have been on a substantial equality as to prices for cans, and that, although the plaintiff would have had to pay more than twice as much freight on its shipments of cans, no Ozark canner would have been in any better competitive position than the plaintiff.

During the period June 2, 1943, to December 31, 1945, the defendant paid or absorbed the freight on all carloads of cans shipped to canners in the Ozark region. None of the freight paid was added to factory price of cars of cans shipped to the two canners at Fort Smith. The Ozark canners not located at Fort Smith were required to pay for cans the factory prices plus an amount equal to the freight from Fort Smith to the point of delivery, which, in the case of the plaintiff, as already stated, was about 36¢ per cwt. In other words, the plaintiff was, in effect, required to refund to the defendant a substantial part of the freight which the defendant had paid,

while the two Fort Smith canners were required to refund no part of the freight on cars of cans shipped to them. This necessarily resulted in the Fort Smith canners and others nearer Fort Smith than the plaintiff having to pay less for their cans than did the plaintiff and other canners in the Ozark region who were located at points more distant from Fort Smith.

While there was nothing inherently evil in the practice of equalizing freight with Fort Smith, which was the logical place to establish a source for supplying cans to the canners in the Ozark region, there is not much doubt that the practice of using the location of the warehouse as a basing point for freight was vulnerable. Fort Smith was not the source of supply of cans shipped to Ozark canners in carload lots. There was nothing unrealistic about the warehouse, but it quite evidently was established not only to provide a means for enabling the local canners to obtain cans by truck but also to meet their demands that something be done to improve their competitive position freightwise, and to avoid the possibility of the establishment of a factory in Fort Smith by a rival can manufacturer. The vulnerability of the Fort Smith warehouse as a basing point for freight was evidently recognized by the defendant and resulted in the abandonment of the practice of equalizing freight with that point on January 1, 1946. We note that William C. Stolk, Vice-President of the defendant in charge of sales, testified relative to this change as follows: "In 1945, as I remember it, some time in the early part of 1945, when the Supreme Court came out with their Staley and Corn Products decisions counsel advised us, in order to, well, for safety sake, in the event the Supreme Court decisions might be construed to apply to the Robinson law, to change our policy, which we did in January, 1946."

It is unnecessary to decide whether, if the defendant had actually made its warehouse in Fort Smith the source of carload shipments of cans to its customers in the Ozark region, that would have justified the use of Fort Smith as a basing point for freight. The warehouse in suit was never

the source of carload shipments, and was not intended to be.

The defendant calls our attention to the following language used by the Supreme Court in Federal Trade Commission v. Cement Institute, 333 U.S. 683, at pages 696–697, 68 S.Ct. 793, at page 801, 92 L.Ed. 1009: "Goods may be sold and delivered to customers at the seller's mill or warehouse door or may be sold free on board (f. o. b.) trucks or railroad cars immediately adjacent to the seller's mill or warehouse. In either event the actual cost of the goods to the purchaser is, broadly speaking, the seller's 'mill price' plus the purchaser's cost of transportation."

To understand, however, what the Supreme Court had in mind, it is necessary to read the following three sentences, 333 U. S. at page 697, 68 S.Ct. at page 801: "However, if the seller fixes a price at which he undertakes to deliver goods to the purchaser where they are to be used, the cost to the purchaser is the 'delivered price.' A seller who makes the 'mill price' identical for all purchasers of like amount and quality simply delivers his goods at the same place (his mill) and for the same price (price at the mill). He thus receives for all f. o. b. mill sales an identical net amount of money for like goods from all customers."

The Supreme Court has not held, so far as we are aware, that an isolated warehouse used as a source of supply of goods to be taken by truck and as a basing point for freight on such goods actually shipped from other places, but not as a source of rail shipments, can be used for the equalization of freight, where that results in the seller's receiving a different net amount of money from some of its carload customers than from others.

■ We think that the District Court was justified in concluding that the defendant's practice of equalizing freight with Fort Smith was unlawful and caused price discriminations which conceivably might substantially lessen competition. We must admit that it is not too easy to understand why, as a practical matter,

equalizing freight with Fort Smith in 1945 was potentially monopolistic, while in 1947 it became lawful and lost its threat to competition merely because a factory supplanted a warehouse.

■ It is our understanding that, in order for a plaintiff to recover damages in a case such as this, it is not enough to show that a defendant was guilty of price discriminations which might lessen or injure competition, but it is also necessary for the plaintiff to prove that the wrong done proximately resulted in ascertainable damage to its business and property.

In Clark Oil Co. v. Phillips Petroleum Co., 8 Cir., 148 F.2d 580, 582, certiorari denied 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437, this Court said: "* * * Wrong without damage or damage without wrong does not constitute a cause of private action, * * *. The Sherman Act and the Clayton Act [15 U.S.C.A. §§ 1–7, 15 note and § 12 et seq.] afford a cause of action for those suffering damages. In their provisions for damages they embody both punitive and compensatory damages but no recovery can be had unless a case for compensatory damages is made."

In Keogh v. Chicago & Northwestern Railway Co., 260 U.S. 156, 164–165, 43 S. Ct. 47, 50, 67 L.Ed. 183, Mr. Justice Brandeis said: "* * * Under section 7 of the Anti-Trust Act, as under section 8 of the Act to Regulate Commerce, [15 U.S.C. A. § 15, 49 U.S.C.A. § 8] (Pennsylvania R. R. Co. v. International Coal Mining Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446), recovery cannot be had unless it is shown, that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted. These damages must be proved by facts from which their existence is logically and legally inferable. They cannot be supplied by conjecture." See, also, Turner Glass Corporation v. Hartford-Empire Co., 7 Cir., 173 F.2d 49, 51–52, and Central Coal & Coke Co. v. Hartman, 8 Cir., 111 F. 96, 98.

■ The plaintiff was required to pay, for its cans during the period June 2, 1943, to December 31, 1945, some $18,000

more than its two competitors located in Fort Smith; but if the freight on its cans had been equalized with St. Louis, as it contends should have been done, it would have had to pay nearly 2½ times as much freight. If all of its local competitors had been required to pay St. Louis freight, that might have enhanced the ability of the plaintiff to compete with them, but the payment of St. Louis freight by the plaintiff would unquestionably have impaired its ability to compete with its other named competitors not located in the Ozark region. The evidence shows that during the period June 2, 1943, to December 31, 1945, every canner in the Ozark region could sell, at ceiling prices, whatever it could pack. It is not conceivable to us that the plaintiff would have been benefited by having to pay, during that period, as freight charges on its cans, more than $40,000 instead of $18,000. We do not doubt that, ordinarily, where a seller is guilty of unlawful discrimination in prices between customers, the amount of the price difference is the measure of damages, but we think that this is not so here.

In the case of Bruce's Juices, Inc., v. American Can Co., 330 U.S. 743, at page 757, 67 S.Ct. 1015, at page 1021, 91 L.Ed. 1219, the Court said: " * * * If the prices are illegally discriminatory, petitioner has been damaged, in the absence of extraordinary circumstances, at least in the amount of that discrimination."

That case, however, did not present any such situation as the instant case. It is safe to say that every Ozark canner was benefited by Fort Smith equalization of freight, but some, due to their location, were benefited more than others. What the plaintiff really complains of is not that it was damaged by such freight equalization, but that it was not benefited by it to the same extent as some of its local competitors.

It is our opinion that the plaintiff failed to prove that it was damaged in its business and property in any amount susceptible of expression in figures by the practice of the defendant in equalizing freight on carloads of cans with Fort Smith.

### Loss of Profits from Delayed Deliveries.

We are satisfied that there is an inadequate evidentiary basis for the District Court's conclusion that the plaintiff suffered a loss of profits because of the delays which occurred in connection with its acceptance of the carload shipments of cans which arrived in February and May, 1945. The record shows that Arvel Blaylock had cans on hand on both occasions; that he had not made arrangements for the raw materials which he testified he would have canned had the shipments of cans been consigned or billed differently; that he could have obtained the cans shipped in February, 1945, by increasing the amount for which he was billed by the difference between Fort Smith and St. Louis freight, as he did later, in 1946, when cars were shipped to him with freight equalized with Memphis; and that he could also have procured the May, 1945, shipments promptly, had he been inclined to do so, by paying the invoice based on St. Louis freight and telephoning or telegraphing the McManus-Heryer Brokerage Company.

The defendant asserts that these claims for loss of profits on account of delayed deliveries, allegedly due to the failure of the defendant to comply with its contract "letter for letter," are nothing more than common law claims for alleged breaches of contract, which could not, in any event, be made a basis for treble damages under the Clayton Act. There is much force in that contention, but we think it is unnecessary to rule upon the question. Arvel Blaylock's conduct in dealing with these shipments and making claims for loss of profits was obviously strategic, and stemmed from the defendant's refusal to accede to his demand that cans be shipped to the plaintiff free of freight, as well as from his interest in enhancing his alleged damages for the purposes of this lawsuit. It is elementary that one may not recover for losses which are readily preventable or avoidable. 15 Am.Jur., Damages, § 27, page 420; 25 C.J.S., Damages, § 33, p. 499. See, also, Sun Cosmetic Shoppe, Inc., v.

Elizabeth Arden Sales Corporation, 2 Cir., 178 F.2d 150, 153, 13 A.L.R.2d 358.

### Morgan Runway Allowance.

With respect to the alleged discrimination because of the runway allowance to the Morgan Packing Company, the District Court ruled that the allowance was a discrimination both as to facilities furnished and as to price. We do not agree. Allowing Morgan 45¢ per thousand cans delivered over its runway was, if discriminatory at all, a price discrimination. There was no possibility of the defendant's furnishing cans to the plaintiff over such a runway. If, because of the allowance, Morgan was required to pay less for cans than other customers of the defendant who were not similarly situated but were in competition with Morgan, that, we think, is all of which any of them could complain.

The plaintiff's contention that it was adversely affected by the runway allowance made to Morgan is based upon the theory that Morgan's products, while not the same as the plaintiff's, competed for the "housewives' dollar," and that, if Morgan's canned goods were a better buy than the plaintiff's canned spinach or canned green beans, the housewife would pass by the plaintiff's product and buy the Morgan product. There is no evidence in the record that any of the canned goods marketed by Morgan during the period in suit were sold at prices which had the effect of diverting housewives from the canned spinach and canned green beans of the plaintiff, or that the plaintiff sustained any actual damage from the granting of the runway allowance. "The only proper proof of damages is the loss to the plaintiff's business, * * *." Sun Cosmetic Shoppe, Inc., v. Elizabeth Arden Sales Corporation, supra, page 153 of 178 F.2d.

We are also of the opinion that the defendant's attempted justification of the runway allowance by evidence tending to show that the allowance was warranted by savings in the cost of delivery, should not have been rejected because the justification involved a comparison between the cost of delivery of cans loaded into railroad cars at the defendant's factory in Terre Haute and the cost of delivering cans over the runway to Morgan at Austin. It seems to us that about the only way of demonstrating the actual savings in cost of delivery at a factory such as that at Austin would be to compare the delivery costs at that plant with similar costs at a plant from which cans were delivered in freight cars.

It is apparent that the defendant must have saved a substantial amount in labor costs and in the maintenance of facilities for shipment by rail, by not having to store, pack, load into cars, and deliver by rail, the cans made at the Austin factory. Whether the saving amounted to 45¢ a thousand cans is problematical. If the plaintiff's business had been shown to have been adversely affected by the prices charged by Morgan for its dissimilar canned products because of the allowance made to Morgan, the damages, we think, would be limited by the amount, if any, by which the allowance exceeded the cost savings of the defendant resulting from the runway delivery. That excess could not have amounted to 45¢ per thousand cans. To the extent that the allowance to Morgan was justified by savings in delivery costs, it could have caused no damage to Morgan's competitors and constituted no actionable wrong on the part of the defendant.

### Quantity Discounts.

We come next to the problem presented by the quantity discounts allowed by the defendant during the period in suit to its largest customers. As we understand the applicable statute, Congress has outlawed only the granting of quantity discounts which the seller cannot justify by "differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered".

In the case of Bruce's Juices, Inc., v. American Can Co., supra, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219, the Supreme Court had before it the identical system of quantity discounts which the Can Com-

pany, the defendant here, had in effect until January 1, 1946. The Can Company had brought an action against Bruce's Juices, Inc., upon certain notes. The defense was that the consideration for the notes was illegal because the plaintiff had violated the Robinson-Patman Act by selling cans to others at prices which discriminated against Bruce's Juices, Inc. Mr. Justice Jackson, who delivered the majority opinion, said in that case, at pages 745–746 of 330 U.S., at page 1016 of 67 S. Ct.:

"* * * The Can Company's contract with all its customers allowed a discount of 1% on annual purchases of $500,-000, and nothing to those whose purchases were less than that. It was so graduated as to give a maximum discount of 5% to a customer whose purchases were $7,000,000 a year. The consequence is that relatively small packers pay 5% more for their cans than their largest competitors.

"It is claimed that this advantage to quantity buyers renders the quantity discount *per se* a violation of the Robinson-Patman Act. To sustain the defense in this case it would be necessary to so hold. It is not denied that Bruce got the same discounts as other purchasers of like quantities when it qualified, and in one year Bruce was in the $500,000 bracket and received the 1% discount. It is not claimed that the Can Company failed to give discounts where earned under this uniform contract, or that discounts were given where not so earned. Bruce received the same discounts as others within its classification and it is not questioned that had it been a purchaser of larger quantities it would have been allowed the same discount as other purchasers of that class.

"Before a court could sustain the defense in this particular case, it would also have to overcome other difficulties of law and fact. The Act does not prohibit all quantity discounts but expressly permits them under certain conditions. It indicates, too, that the Federal Trade Commission is the appropriate tribunal to hear in the first instance the complicated issues growing out of grievances against a quan-

tity discount practice of a seller. 49 Stat. 1526, 15 U.S.C. § 13(a), 15 U.S.C.A. § 13 (a). Quantity discounts are among the oldest, most widely employed and best known of discount practices. They are common in retail trade, wholesale trade, and manufacturer-jobber relations. They are common in regulated as well as unregulated price structures. Congress refused to declare flatly that they are illegal. They become illegal only under certain conditions and when they are illegal it is as much a violation to accept or receive as to allow them. Bruce, in one of the years included in its balance of account, purchased more than a half million dollars of cans on which it received precisely the kind and amount of discount it now asserts to be illegal.

"The argument is made that such a remedy as Bruce seeks here would support the anti-monopoly policy of Congress. But Bruce is not complaining of the high price of cans. Bruce complains of a lower price for cans to others—which would enable competitors to put their products on the market cheaper. This may well put Bruce to some disadvantage, but it does not follow that Congress would forbid the savings of large-scale mass production to be passed along to consumers. The economic effects on competition of such discounts are for the Trade Commission to judge. Until the Commission has determined the question, courts are not given guidance as to what the public interest does require concerning the harm or benefit of these quantity discounts on the ultimate public interests sought to be protected in the Act. It would be a far-reaching decision to outlaw all quantity discounts. Courts should not rush in where Congress feared to tread."

The Supreme Court decided that the alleged violation of the Act by the Can Company was not a defense to the action on the notes, and that the remedy of Bruce's Juices, Inc., if any, was in its pending action for treble damages under the Clayton Act.

Mr. Justice Murphy, who wrote the dissenting opinion in the case, said at pages

764–765 of 330 U.S., at page 1025 of 67 S.Ct.:

"The Court intimates, without actually deciding, that courts should not allow this type of defense to be raised until the Federal Trade Commission has determined the economic effects of quantity discounts on competition. The fear is expressed that without the Commission's guidance, courts might strike down all quantity discounts and create untold retroactive liabilities.

"The short answer is that we should be reluctant to assume that judges are unable to comprehend the Robinson-Patman Act and the standards it sets up in regard to quantity discounts. It may be granted that the Federal Trade Commission has more technical knowledge and experience in dealing with the complexities of this problem than most courts; and the Commission's judgment would be of inestimable value to any judge called upon to deal with quantity discounts. But in the absence of some action by the Commission, courts must act as best they can within the framework provided by Congress. The Act, 15 U.S.C. § 13(a), 15 U.S.C.A. § 13(a), specifically recognizes that quantity discounts are illegal only where they lessen or injure competition or tend to create a monopoly; and where price differentials are justified by differences in costs of manufacture, sale or delivery, the discounts are permissible. This matter is a complex one, but it is no more complex than many other problems which face the courts."

Subsequently, Bruce's Juices, Inc., in its action for treble damages under the Clayton Act, as amended, obtained a judgment against the American Can Company in the United States District Court for the Southern District of Florida, 87 F.Supp. 985. This judgment has recently been affirmed by the United States Court of Appeals for the Fifth Circuit in American Can Company v. Bruce's Juices, Inc., 187 F.2d 919. Of the defendant's system of quantity discounts in effect prior to January 1, 1946, that court said, 187 F.2d at pages 923–924:

" * * * Manifestly, the discount system employed was not a good faith effort to devise a method whereby price discounts would be functionally available to all customers. See Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196; Russellville Canning Co. v. American Can Company, D.C., 87 F.Supp. 484; Bruce's Juices, Inc., v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219.

"Here, during the period involved, only two of defendant's numerous customers were able to qualify in any year for the maximum 5% discount, and only about 1% received the benefit of any discount. Under such circumstances, the district court correctly found that the discount schedule was tainted with the inherent vice of 'too broad averaging', as a result of which it favored a few large customers at the expense of a multitude of small buyers, and that it was therefore unlawful and discriminatory. Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822; see, also, Federal Trade Commission v. [A. E.] Staley Co., 324 U.S. 746, 65 S. Ct. 971, 89 L.Ed. 1338.

"Certain it is that quantity discounts are not *per se* illegal or condemned by the antitrust statutes. Nevertheless, any discount system, such as here, which arbitrarily excludes 98% of the customers involved from qualifying for any discount whatever imposes a heavy burden on its proponent to justify its continued existence. This burden defendant has here signally failed to meet."

If, in an action such as the instant one, a District Court has the same power as the Federal Trade Commission to disapprove, under subdivisions (a) and (b) of § 2 of the Clayton Act, as amended, 15 U.S.C.A. § 13(a) and (b), a system of quantity discounts, that court can, no doubt, condemn such a system on the ground that it was functionally available to too few customers. If, however, in the instant case, the District Court was, as we think, limited to deciding whether the quantity discounts granted by the defendant did not exceed a due allowance for the difference in the cost of selling cans to the different classes into which its customers were divided, the court could not concern itself with the question whether the system was fair and equitable and functionally availa-

ble to all customers. It is true that in its opinion the District Court stated that its sole function was to ascertain whether the defendant's justification of its quantity discount system was adequate, but we think the court went further than that.

With respect to the defendant's attempted justification of its quantity discounts, the District Court directed attention to the following matters: (1) the division of the customers into three classes; (2) Calpack, Libby, Morgan, and Stokely were each allowed a discount upon its purchases for all of its plants; (3) aggregation of purchases by separate plants for discount purposes was permitted where the plants were operated by a single entity or where there was common control and ownership; (4) expenses attributable to one customer were attributed to his class; (5) some expenses were allocated on the basis of contact hours—time spent by salesmen, service men, and others, on a customer,—while other expenses not directly attributable to any one customer were apportioned among the three classes on an allocation formula which was arbitrary; (6) the cost study was not continued beyond 1941; (7) the defendant did not change its system of quantity discounts in accordance with changing conditions, particularly those brought about by the War; (8) Classes A and B were so restricted and Class C so broad that practically no independent customer was given an opportunity to escape the class to which he was consigned or to qualify for a higher discount bracket; (9) the defendant's cost justification does not isolate or determine the cost of selling or servicing any individual customer in Class C; (10) by including 98% of its customers in Class C, the defendant took no account of whether such customers purchased on open order or under exclusive contract, of whether they bought for cash or credit, nor of whether they ordered cans by the carload or less than carload, and ignored conditions prevailing in different parts of the nation. The court then concluded that the defendant's quantity discount systems, old and new, made other than due allowance for differences in cost of sale resulting from differing quantities of cans sold.

It seems to us that the applicable statute discloses no Congressional intent to authorize a District Court, in an action such as this, to reject a seller's attempted justification of its quantity discount system unless the justification meets all of the requirements which the District Court in this case evidently considered essential. If a manufacturer granting quantity discounts is required to establish and to continuously maintain a cost accounting system which will record the expenses incurred in selling every individual customer and all of the data which the plaintiff deems essential, the burden, expense and assumption of risk involved would seem to preclude the granting of quantity discounts, at least until the approval of the plan by the Federal Trade Commission had been secured.

We cannot say that the District Court was compelled to accept the defendant's justification of the quantity discounts which were granted. If, however, the system was adopted in good faith and the cost study during the test period of more than four years was honestly maintained, and reflected with substantial accuracy the differences in selling costs as between the customers in Class C and those in Classes A and B, we think the court's conclusion that the justification was inadequate because it was not continued beyond the test period, did not reflect cost differences as between individual customers, and failed to take into consideration conjectural geographical differences in selling costs and other matters which might be thought to have some speculative bearing on such cost differences, was not justified.

The case of Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 882, 92 L.Ed. 1196, which is heavily relied upon by the plaintiff, was not a controversy between an alleged victim of discriminatory price practices and a producer, but related to the validity of a cease and desist order of the Commission affecting a plan of price discounts of the Salt Company which the Commission had found to be unjustly discriminatory. The Salt Company had offered no cost study to justify its plan. We think the District Court in the

instant case, in determining the sufficiency of the defendant's attempted justification, applied too rigid a standard.

Damage to "Competitive Position."

We are of the opinion that there was an inadequate evidentiary basis for awarding the plaintiff damages for the alleged impairment of its competitive position. The District Court apparently concluded that the failure of the plaintiff to maintain earnings during the postwar economic conditions upon the same level as previously, could fairly be attributed to discriminatory practices of the defendant. This upon the theory that all other causes had been eliminated and that it was reasonable to infer that the plaintiff had suffered a sort of financial attrition due solely to the practices of which complaint is made. This conclusion we regard as too speculative and conjectural to sustain any award of damages. There is no showing that the plaintiff ever ran out of funds. Its earnings prior to 1946 were large and in that year its profits yielded a high percentage of return upon its invested capital. After January, 1945, the plaintiff paid for its cans in cash and insisted on paying more for them than the defendant demanded. The plaintiff persistently refused to accept the return of what the defendant considered to be overpayments.

We think there were too many factors bearing upon the decline in the plaintiff's earning power to justify blaming it upon the trade practices of the defendant. It seems more probable that the decline in profits and business was due to the declining market, the declining availability of raw products during 1946 and 1947, and the declining ability of Arvel Blaylock to carry on the business because of his illness. We note that Ray Klein, a St. Louis food broker who testified for the plaintiff, stated that in his opinion Arvel Blaylock was one of the most important assets of the plaintiff. There was apparently no one in the plaintiff's organization qualified to fill his place. Up to January, 1945, when the controversy between Arvel Blaylock and the defendant over freight equalization became acute, he had made a phenomenal success of the plaintiff's business. The evidence indicates that thereafter one of his main interests was in laying the foundation for this present treble-damage action against the defendant. That his ability to carry the burden of management in 1945 and 1946 was impaired by illness is clear. This is not to say that Arvel Blaylock's illness was necessarily the sole cause of the decline in the plaintiff's profits, but we think the evidence indicates that it was one of the factors which at least affected the ability of the plaintiff to maintain its "competitive position." Climatic conditions, floods, crop failure, the change from a noncompetitive to a competitive market, were all factors affecting the plaintiff. While they were common to all Ozark canners, there is no adequate basis for assuming that their impact affected all canners alike. There is no indication that any Ozark customer of the defendant whose competitive position was no dfferent from that of the plaintiff suffered any impairment of its earning power by virtue of the trade practices of which the plaintiff complains.

We realize that there can be, and are, honest differences of opinion about the problems presented by this controversy and other similar controversies involving the applicable statute, which Mr. Justice Jackson has correctly characterized as "rather difficult." Bruce's Juices, Inc., v. American Can Co., supra, at page 753 of 330 U. S., at page 1019 of 67 S.Ct. Our views differ in some respects from those expressed by the Court of Appeals of the Fifth Circuit in American Can Co. v. Bruce's Juices, Inc., supra, 187 F.2d 919.

We conclude that the defendant is entitled to a new trial in conformity with the views expressed by us.

The judgment appealed from is reversed and the case is remanded for a new trial.

JOHNSEN, Circuit Judge (dissenting in part).

A few observations as to my concept of the nature of the injury and the damages possible under the Robinson-Patman Act, 49 Stat. 1526, 15 U.S.C.A. § 13, should perhaps be made.

We recognized in Elizabeth Arden Sales Corporation v. Gus Blass Co., 8 Cir., 150 F.2d 988, that two kinds of injury "in his business or property", 38 Stat. 730, 15 U.S.C.A. § 15, were possible from discriminations under the Act—one direct or immediate and the other indirect or consequential. Thus, we held in that case that discriminations in favor of one dealer in a seller's products as against an immediate competitor, in granting allowances for services or facilities furnished by the dealer in marketing the seller's products, or in providing contributions of services or facilities to the dealer for such marketing, which were violative of section 2(d) and (e), 49 Stat. 1527, 15 U.S.C.A. § 13(d) and (e), of the Act, were recoverable as direct or immediate damages, to the extent of the illegal difference, where that difference represented money which the dealer would have saved in expense or for which he would have been reimbursed in contribution, if the seller had accorded him equal treatment with his competitor.

This rule of direct damages as between immediate competitors also clearly, I think, has application to price discriminations, violative of section 2(a) of the Act, 15 U.S.C.A. § 13(a), and it seems to me that the Supreme Court has so indicated by its statement in Bruce's Juices, Inc., v. American Can Co., 330 U.S. 743, 757, 67 S.Ct. 1015, 1021, 91 L.Ed. 1219, that "If the prices are illegally discriminatory, petitioner has been damaged, in the absence of extraordinary circumstances, at least in the amount of that discrimination."

Since the Robinson-Patman Act was intended primarily to afford the small business man a means of realistically protecting himself against discriminations in his competitive position, Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 49, footnote 18, 68 S.Ct. 822, 92 L.Ed. 1196, it is only natural that much, if not most, of the litigation arising under the Act should involve discriminations between immediate competitors under subsections (a), (d) and (e) of section 2, and that the damage in such cases normally will consist of the amount which would have been saved in price or expense or restored through reimbursement, if there had been equal treatment. I cannot think of any plainer injury to a man in his business or property than for him to have to pay out of his treasury money which he ought not to have been required to do or to fail to get back money therein for which he should have been reimbursed. Damages in the cash amount or cash value of such illegal discriminations seem to me therefore virtually automatically to follow under the Act as between immediate competitors, i. e., those engaged in the same line and area of trade.

I do not, however, mean to imply, that the extent of the discrimination necessarily marks the limit of the possible injury or damage in this type of situation, as Sun Cosmetic Shoppe v. Elizabeth Arden Sales Corporation, 2 Cir., 178 F.2d 150, 153, may appear to intimate, at least as to the instance dealt with in the opinion. It is possible for illegal discriminations between immediate competitors to have consequential effects also, of such a nature as can properly, I think, give rise to a recovery right beyond the amount or value of the discrimination. Thus, price discriminations, in addition to the direct pecuniary injury to a dealer in his business treasury from being required to pay more for his purchases than his immediate competitor, also conceivably, if sufficiently continued, could operate to destroy or impair his business in the seller's products or the business conducted by him resting upon a collateral use of such products.

Again, as we pointed out in the Arden case, supra, 8 Cir., 150 F.2d at page 996, even between immediate competitors, discriminations obviously are possible of a nature which would not involve the direct taking of money out of a dealer's treasury in extra cost or expense or the failure to make direct additions thereto in reimbursing allowances, so that no direct or immediate damage could exist but only consequential injury could be claimed to have been produced. Thus, we cited in the opinion, as an example, the granting of a discriminatory allowance for use by a dealer in advertising or promoting his trade in the seller's goods, where the expenditure was one which would not have been made by

such a dealer except for the allowance, and where the result had been to take away the trade of his competitor. I am now only giving theoretical examples, without attempting to consider where in a particular situation the factor of remoteness might have to be regarded as controllingly entering in on the recovery right.

To go still further, since injury under the Robinson-Patman Act can only exist in relation to competition, when the alleged discrimination has not been one between primary or immediate competitors but has occurred simply on the broad horizon of secondary or unimmediate business competition—such as would be involved in the trial court's theory of a canner of spinach and a canner of some other vegetable being competitors, in that they both are bidders for the housewife's food dollar—I am of the opinion that the amount of the discrimination can not be regarded as a direct or automatic damage and that the only injury capable of being recognized would be one of consequential effect, with the burden necessary in such a situation of establishing proximateness and reasonable certainty as to the fact of injury as a basis for any recovery because of the discrimination.

Thus, in the matter of the Morgan runway allowance, discussed in the majority opinion, since Morgan and appellee were not immediate or specific competitors, in view of their different kind of food products, the damages, if any, recoverable by appellee because of the allowance made to Morgan could in my opinion only be consequential in nature, from such invasion of the market for canned spinach and green beans as the allowance had made it possible for Morgan's different products to make and as appellee could be shown to have suffered loss by reason thereof. The discrimination could not give rise to direct or automatic damages, because appellee's treasury would not be affected in relation to its immediate competitors, and in the field of general competition the position of the spinach and green beans industry and that of appellee as a part of it might not even be affected at all. If, however, there were consequential effects from the discrimination, which were entitled to be recovered, I cannot agree with the majority, in their adoption of the view of Sun Cosmetic Shoppe v. Elizabeth Arden Sales Corporation, 2 Cir., 178 F.2d 150, that such consequential damages would have to be limited to "the amount, if any, by which the allowance exceeded the cost savings of the defendant resulting from the runway delivery." The statute imposes no limitation on the amount of actual consequential damages and none exists otherwise legally except as a matter of remoteness. Neither in relation to immediate competitorship nor to secondary competition, is there any basis under the Act for imposing such a limitation upon the amount of damages recoverable for consequential injuries from illegal discriminations.

On the principles which I have discussed above, I further feel that the trial court was entitled to treat the so-called freight equalization with Fort Smith as a price discrimination in favor of the two Fort Smith canners against appellee and, because they and appellee were engaged in immediate competitorship, to allow appellee direct or automatic damages for the difference in the amount which appellee was required to pay appellant for its cans over them.

What appellant did was to include delivery at Fort Smith in its price to the Fort Smith canners and to make appellee pay 36¢ per cwt. of the cans above this amount. The 36 cents represented the amount of the freight rate from Fort Smith to Russellville. But appellee's cans did not come from Fort Smith. Those for appellee, as well as those for the Fort Smith canners, were shipped direct from appellant's factories in Indiana and Illinois to their separate destinations and the shipping cost to Russellville was no more than to Fort Smith. And beyond this, there was admittedly no legal basis for any purported use of Fort Smith as a point for freight equalization.

In this situation, appellant could not properly make a charge to appellee greater than its price to the Fort Smith canners. If it wanted to make any freight absorption for its purchasers at Fort Smith, it

had to make an equal absorption for their immediate competitor at Russellville—unless some other basis for distinction between such purchasers existed under the Act and was used, which was not here the case. I do not believe that it is of any materiality in these circumstances that the cans had cost appellee less than appellant could have required it to pay under its contract, which called for freight equalization with St. Louis. The contracts of the Fort Smith canners similarly called for freight equalization at St. Louis.

Appellant chose to depart from all of these contracts in order to give the Ozark canners a cost benefit or allowance. It gave the Fort Smith canners a bigger benefit or allowance than it gave appellee at Russellville. The extra 36¢ per cwt. which it made appellee pay was money which the Fort Smith canners saved and which appellee would not have been out-of-pocket if it had received equal treatment with them. In appellee's position as an immediate competitor of the Fort Smith canners, this represented direct or automatic damage to its business treasury for which the trial court was entitled to allow a recovery as such.